RETTA WILEY, Appellee, v. C. A. FLECK, Appellant.

SEDUCTION: Divorced Woman and Married Man. Sexual inter-
1   course, actually resulting from protestations of love by a married man for a twice-divorced woman, of chaste character, reinforced by repeated promises of marriage as soon as a divorce can be obtained, designed for the purpose of inducing such intercourse, constitutes legal seduction.

SEDUCTION: Promise of Marriage by a Married Man. Evidence
2   of a promise of marriage by a married man is admissible as bearing on the sincerity and good motives of the promisor in his protestations of love.

APPEAL AND ERROR:  Harmless Error—Withdrawing Improper
3  Exhibit.  After the erroneous reception in evidence of a written
exhibit which embodied the statements of fact already testified
to by an impeaching witness, the immediate withdrawal of the
same, without reading to the jury, with direction by the court
to the jury to wholly disregard it, effaces all possible prejudice
to the objecting party.

TRIAL:  Belated Opening of Case for Additional Testimony.  Open-·
4  ing the case for additional testimony, in order to clarify ob-
scure points, even as late as the pendency of a motion for a
directed verdict, is within the fair discretion of the court.

*Appeal from Greene District Court.*—M. E. HUTCHISON,
Judge.

JULY 6, 1920.

REHEARING DENIED SEPTEMBER 25, 1920.

ACTION to recover damages for an alleged seduction.
Opinion states the facts.  Verdict and judgment for the
plaintiff.  Defendant appeals.—*Affirmed.*

*J. A. Henderson* and *C. H. Van Law,* for appellant.

*William G. Clark, F. L. Groesbeck, Howard & Sayers,* and
*John McLennan,* for appellee.

GAYNOR, J.—Plaintiff brings this action in three counts,
and in each count asks judgment against the defendant for
a specific sum.  These sums she says should be allowed her
as compensation for the wrongs charged to
have been done to her by the defendant.

1. SEDUCTION :
divorced
woman  and
married man.

The first count is based on an alleged rape,
committed on or about the 30th day of April,
1916.  The second rests upon the same char-
acter of offense, alleged to have been com-
mitted on or about June 1, 1916.  In the
third, she says that, on or about the 1st day of June, 1916,

defendant, by false promises and corrupt and seductive arts, and by professions of great affection and a great love for her, coupled with a desire and expressed purpose to marry her, seduced and debauched her; that the act of seduction occurred soon after the alleged rapes referred to in the first and second counts.

To each count the defendant interposed a general denial, and further alleged that the action therein set out was barred by the statute of limitations.

The cause was tried to a jury, and a verdict returned for the defendant on the first two counts. On the third count, however, the jury returned a verdict for plaintiff. A motion for a new trial was submitted and overruled, and judgment entered on this verdict. The defendant alone appeals.

This eliminates from consideration all questions involved in the plaintiff's claims made in the first and second counts, except in so far as the testimony offered in support of these counts has probative bearing upon the issues tendered in the third count.

The defendant, as a ground for reversal, says:

1. That, after the plaintiff had rested her cause, and a motion had been made by the defendant that the court instruct the jury to return a verdict for the defendant on this third count, and, after defendant had fully argued and submitted the motion, the plaintiff asked leave, and the court permitted her, to introduce further testimony in support of her contention, over defendant's objection. It is the thought of the defendant that the court was about to instruct the jury as requested; that the plaintiff was advised of this, and, perceiving the danger that attended her then situation, then asked for leave, and was permitted, to introduce further testimony upon a vital fact in the case; that this was of great prejudice to the defendant. The thought of the defendant is that the court abused its discretion in allowing the plaintiff to introduce further testimony after the motion for a directed verdict had been presented to the court and fully argued.

2. That the court erred in overruling a motion for a

directed verdict, made by the defendant as to this third count.

As to this second assignment, the thought of the defendant is that the evidence was insufficient to support a verdict in plaintiff's favor, should one be returned.

3. That the court erred in overruling a motion to set aside the verdict for a new trial, because the verdict is contrary to the law, and is not supported by the evidence.

4. That the court erred in giving the eleventh instruction, given on its own motion.

5. That it erred in permitting certain exhibits to be introduced in evidence, to which particular reference will be made hereafter.

We will take up the second and third assignments together, to wit: Did the plaintiff, at the conclusion of all the evidence, make out a case for the jury on the third count of the petition?

It would serve no useful purpose to set out even the substance of all the evidence that was offered in support of her claim based on this count. There is a sharp conflict in testimony as to the matters relied upon by the plaintiff to sustain her contention. It is not for us to determine the credibility of the witnesses or the weight to be given to their testimony. That lies peculiarly within the province of the jury. The jury has resolved the matter in favor of the plaintiff. We will, however, set out briefly the facts that the testimony tends strongly to show, and which, if found by the jury to be facts, justify its verdict. Before beginning a recitation of the evidence touching controverted facts, it is proper that we set out that which does not appear to be controverted at all.

At the time of the happening of the matters herein complained of, the plaintiff was about 44 years old, and unmarried, though twice married and twice divorced. She married her first husband in 1891, and lived with him about 4 years. No children survived this marriage. This marriage was legally dissolved in 1895, on her complaint. In 1897, she again married, and lived with this husband about 10

months. She was àgain divorced. At this time, plaintiff was about 25 or 26 years of age. Thereafter, she came to the city of Des Moines, and was engaged for several years in various avocations through which she earned a livelihood, supporting herself by her own labor, and, a portion of the time, supporting her mother and imbecile brother. For a time, she was engaged in the millinery business, worked in dry goods stores, and subsequently kept a boarding house. She was thus occupied at the time the defendant met her. This was some time in February, 1916. The defendant is, and was at this time, a farmer, residing near the city of Jefferson, and was about plaintiff's age. He had a son, 18 years old, residing with him on the farm, and a married daughter; but she lived in a home of her own. Defendant's wife had separated from him, and was then living in the city of Jefferson. The record shows that the separation was permanent, and was so understood by defendant and his wife, and a divorce was in contemplation. At the time these parties met, the plaintiff's mother was dead, and had been dead then about 2 years. Plaintiff and defendant met for the first time in February, 1916. They had never seen each other before. The meeting took place at plaintiff's home. She details it substantially as follows:

"He came to my home, and told me that the Ladies' Aid Society sent him to me, and had highly recommended me to him as a good woman to keep house for him. These ladies knew my circumstances, and they thought it would be good for me to have a change. They had heard me say that, if I could get my brother on a farm, I could make something of him. Defendant told me the minister gave him my name, and recommended me to him. He wanted me to keep house for him. I told him it would be impossible for me to leave my home and keep house for anybody. I told him I had a few boarders, and couldn't possibly leave my home. He wanted me to write to him. He came back, in about two weeks, and insisted that I should come and keep house for him. I then told him it was impossible. On this second visit, he made love to me. Told me he loved me, and wanted

me to go and keep house for him. I told him I was very sorry, but I couldn't return his love; that my love spirit was dead. He said, 'I am sure you will learn to care for me.' I said: 'Oh no, you would soon grow tired of my brother, and then you would soon grow tired of me through my brother.' My brother is mentally deficient, and shows it in all his manners. He wouldn't take no for an answer, at that time. He came again, about 4 o'clock in the afternoon, and stayed for supper, and wanted me to go to a theater with him. I invited a lady friend up to go with us, so we all three went to the theater that night. Ella Gilliland is the lady. I had known her for about 8 years. We have chummed together back and forth. She is now the wife of the defendant. He stayed over another day, and tried to have me go. On this day, he also stayed to supper. He said he didn't want anyone to keep house for him but me. I was the one he wanted, and I was the one he was going to have. I told a Mrs. Minear about the place. She came up to talk with him. He wouldn't talk to her. When he first came, he told me his wife had left him, and taken all the furniture, and he wanted me to bring all my furniture, because he thought I would be more contented to stay with my own things, and I brought all my furniture when I came. I consulted his daughter about my going up, and asked her if she thought it would be all right for me to go and keep house for her father. He kept telling me all the time he was going to have a divorce; that he would soon have a divorce; that he was going to have it in April; that it was pending in court. After his second visit, he came again, in about three weeks, and stayed three or four days. He took supper with me every evening. He stayed down town somewhere at night. It was about the last of March that I first visited his home. When I came, he took me to his daughter's house. She seemed glad to receive me, and was very nice. She told me her mother was gone forever. I came to stay on the 12th of April. To secure my promise to come to the farm, he kept insisting that I should promise to be his wife, and come up and keep house for him until he could get a divorce, and

then we would be married. I first told him I wanted to stay in my own house until his divorce was granted. He said: 'What is the difference? I need someone to help me. I got to have someone right away.' He told me he had 420 acres. He told me he had to employ help, and had to have someone to do the cooking and care for him. He told me he just didn't want anyone else but me, and he was bound to have me for his wife. He promised that my brother should always have a home with me. He wanted me to bring everything, because 'I was going to stay there always.' I took all my furniture and all my things. After I came, I couldn't quite grasp my bearings. I couldn't quite understand it. He talked strange things, in a way. He would say funny, suggestive things. I would say, 'What makes you talk like that to me?' and he would answer: 'Oh, what is the difference, baby? We are going to be married anyway.' He would just say little, bad things. Then he would talk about his former wife. He said she was living a bad life with other men. Then he made the suggestion that it would be nice for us to live that way until he got his divorce, so we could be married, I said, 'I don't like that.' His answer always was: 'What is the difference, baby? We are going to get married anyway.' I talked to him of higher and better things, and of a better way of living, and about our souls, and he said: 'My soul died when I was born. My hogs and my money are my God.' We went out frequently to different places in the country. We went to different places for auto rides; visited relatives of the family. He said he wanted me to go with him wherever he went. 'He was so proud of me.' He was certainly showing all kinds of affection towards me. He accompanied the statements with the usual manifestations of affection and love. From my experience as a woman, I thought I understood his statements and his demonstrations towards me. I thought he was an honest man. When I first came there, I thought he was an honest man. He was awfully good to me. I think that it was on the 12th of April that I came to his farm, and went immediately into the household as a house-

keeper, and did the work around there. I did all the work there, with the assistance of my brother, until I left, in October following. The first evening I was there, we sat down stairs and visited quite a while. He continued to make demonstrations of love and affection for me. I accepted his attentions under the promises that he had given me, relying upon the promise to get married some time, though I knew he was then married. I knew his divorce was pending. As this went on, from day to day, he seemed to grow fonder of me all the time. He seemed to hate to leave the house for the field. He wanted to stay in the house all the time, and would send his son to the field. He said he would rather stay in the house and help me. If he did go to the field, it wouldn't be long until he returned. He kept saying he wasn't married, and he would have his divorce, and we were going to be married as soon as he got his divorce. The first assault I complain of was the 30th day of April, Sunday afternoon. My brother and his son had gone to town. On this particular afternoon, we were sitting in the sitting room on a sofa. He was going on with his demonstrations of love and affection, and he asked me to go into the parlor. He said, 'Let's go into the parlor and sit on the davenport.' We went in there. He put his arms around me. He had been kissing me and petting me and declaring his affection for me. Of course, I knew that his divorce was pending, and I knew he was married, and I knew his wife wasn't there. He was a very strong man; weighed 250 pounds. As he went to sit down on the davenport in the parlor, he slipped me down on the floor, and pinned me to the floor and assaulted me. It was unexpected. He wanted me to be bad with him. I told him I couldn't do anything like that, and struggled until I was worn out. He overpowered me, and I couldn't do anything to defend myself, and had to surrender. After he had succeeded, and I had gained my feet, I told him I wouldn't stay there another day. He embraced me. He forced his embraces upon me, and said, 'Baby, you will never leave me,' and tears came into his eyes, and he said: 'I wish I had my divorce. We would go

today and get married.' He said, 'It will not happen again.' He said he wasn't going to let me leave him. Up to the time of the assault, he had been gaining more of my confidence. After this assault, he promised I would not have to live that way with him; that he was sorry that he did that way, and he begged me to remain with him; that he would soon have his divorce, and we would be married. I told him that, if he would treat me right, I would stay with him. He said, 'I will treat you right, baby,' and after that, he treated me very nice, for a couple of weeks. Later, he came to my room, and tried to have intercourse with me, but I prevented him. He seemed angry for several days. At the time of this occurrence, he said: 'Well, what is the difference? We are going to be married anyway.' He was always saying that. He didn't attempt to use much force at this time. He stayed in my room about half an hour, and then went away. About the first of June he assaulted me again. I had gone into my room to take a bath and rest. He came into my room. I said, 'What do you want, Charlie?' He said: 'It is lonesome down stairs. I don't want to stay there by myself.' I told him I would be down in a minute. He came and laid down on my bed; said he was going to lie down by my side. I had nothing but a kimona on. He took my kimona off of me—tore it off. I had fallen from a cherry tree, a few days before, and my arm was paralyzed and helpless. I made all the resistance I could. He handled me very easily that day, because I was weak and my arm was paralyzed and I was sick. He just held me there with his body until he was ready to do what he wanted. He had intercourse with me at that time. After this, he became more or less apologetic. He came to my room, and made love to me. He would come when I was asleep. He would get in bed with me, and say, 'Oh, baby, I am afraid.' He would smother me with kisses. From that time on, he continued to assure me of his love, and that he intended to marry me —always promising he would marry me. I told him: 'Please go and settle it with your wife, so we can be married, and have it all settled.' "

She was then asked these questions:

"Now, Mrs. Wiley, I will ask you whether, in spite of the force that had been used on you, about which you have testified, you still believed the professions and assurances of love and affection that the defendant made to you. A. I was perfectly sure that he intended to be fair with me, and stay by his promises with me. I would never have stayed with him at all, if it had not been for that."

She was then asked this question:

"Now, what occurred after these assaults, in the succeeding period that you remained there, as to the defendant's coming to your room, from time to time, in the night? Tell how frequently he came. A. Well, he came anyway two or three times a week. He seemed to have me in his power more than at any other time. Q. Now, what occurred when he came to your room at these times, two or three times a week, about which you testified? A. He would always make love to me and caress me, call me endearing names, and that, of course, would lead to another intercourse each time. I tried to persuade him to go away and leave me alone until we could get married. He couldn't grasp my bearings. I couldn't prove myself to him. I couldn't tell what I was there for—sweetheart, servant, or mistress. Q. What did he say to you when you said this to him? A. He would say, 'Oh, baby, we are going to get married anyway, just forget it.' Then he would embrace me and make love to me and say he couldn't stay away from me. I would not have submitted to him, had it not been for this. This continued all the rest of the summer after the first of June until I left there in October. After I left, he visited me in Des Moines. He asked me who I was going with, and urged me to go with someone. I told him I couldn't go with anyone, after he treated me like he had. He answered: 'Well, I will tell you. You have misunderstood all my love. All I wanted was to gain revenge on some good woman, because my wife had deceived me.' "

This is practically plaintiff's story.

The defendant admits the intercourse, does not deny the

protestations of love, but charges the plaintiff with being a vampire; claims that she solicited and invited all that she now complains of.

Assuming the plaintiff to be the subject of seduction, assuming that the plaintiff had a right to rely upon the assurance of love and affection, so coupled with a tentative promise of marriage, the jury could not well do otherwise than return a verdict for her in some sum. We take it that it is not seriously contended by the defendant that, if the plaintiff is the subject of seduction, and sufficient arts and promises were made to support a claim of seduction, the defendant is not liable. The contention of the defendant seems to be that, because the plaintiff had been married and divorced, she necessarily had such experience and knowledge of the lecherous ways of men that she should be immune from their wiles, and, being immune, as a matter of law cannot invoke the protection of the law, made for the protection of those who are led into yielding in reliance upon the false promises and artifices of designing men. It seems to be the thought of the defendant that a woman who had been twice married, who had reached the age of 44 years, who had the experience in life that the record shows this plaintiff had, cannot be heard to say that she relied upon the promises and protestations of love such as this record shows were made to her by the defendant, and cannot be heard to say that she was justified by them in submitting, or in being led into submission, through the operation of their influence upon her mind. It is true that, in this sort of offense, at common law the woman was considered *particeps criminis* with the man, and the man was not punished criminally for his participation in the joint delinquency. Courts, however, departed from this doctrine. It was observed that, in many instances, unmarried females of chaste character needed the protection of the law from the lustful machinations of evilly disposed men who resorted to flattery, blandishments, courtship, and false promises, to ruin their too confiding victim. In every case of seduction, the jury must be able to say first that the woman was of chaste char-

acter; that false promises and artifices were used to induce
her to surrender her virtue; that she did surrender her
virtue because of the false promises used.   Further,. we
might say, it must appear that the false promises, machin-
ations, flattery, or artifices used were of such character and
were used under such circumstances that it can be said,
after the act is accomplished, that the woman submitted to
the act by reason thereof.   The defendant contends that a
woman who has been once married is possessed of such
knowledge that she ought to be immune from the seducer's
arts; but it cannot be said that, as a matter of law, a di-
vorced woman is not within the protection of the law which
punishes the seduction of a woman of previously chaste
character.   There is nothing unchaste or immodest in the
marriage relation, nor does that relationship debase or
lower the standard of morals and right living.   We should
have to say that it does, if we sustain defendant's conten-
tion.   A widow may be as pure in thought, as chaste in
purpose and life, as she would have been had she never sus-
tained the marital relationship; and, if this be so, she is
as much within the protection of the law as one who was
never married.   The most that can be claimed for the pre-
vious marriage is that it tends to show that she possessed a
knowledge of life and of the relationship of the sexes which
would make it improbable that she would yield to the blan-
dishments of the seducer.   But that makes it a jury question.
We think the right doctrine is announced in *State v. Wal-
lace*, 79 Ore. 129 (154 Pac. 430).   It was there held that,
if it be reasonable that a woman once fallen from virtue
may, upon proof of reformation, be the subject of seduction,
then a woman who has become a widow, after a married life
of virtue, is surely entitled to no less protection.   To hold
that previously married women are not included within the
protection of the law would be tantamount to saying that by
marriage a woman becomes unchaste, and so loses the pro-
tection of the statute.   Confidence and affection seem to play
a part in all cases of seduction, and inducement may lead
even a previously married woman to consent.   We think

there is nothing in this contention. Whatever there is in the fact of plaintiff's previous marriage that has any probative force upon the issues here tendered, it goes only to negative her claim that she relied upon the actions of the defendant in surrendering her virtue. Whether she did or not is a question of fact, and not of law, and is to be solved by a consideration of the whole record; and it is for the jury to solve, according to the very right of the matter.

On the question as to whether the words "an unmarried female of previous chaste character" include in their meaning a widow of chaste character, see *State v. Eddy*, 40 S. D. 390 (167 N. W. 392), in which it is said:

"It might properly be the basis of an argument to the jury in the discussion of the question whether the prosecutrix really relied upon the promise, but we think no court should say, as a matter of law, that a woman who has been married is incapable of being the victim of seduction."

It is contended that, inasmuch as the defendant was a married man, and this fact was known to the plaintiff, she cannot be heard to say that she relied upon a promise to do that which, under the law, she knew he had no right to do. As to this, we have to say that the plaintiff does not rely solely upon the promise of marriage, as an inducement to her submission. This was always coupled with protestations of love and affection, abundantly and profusely showered upon her. This expressed desire and promise to marry added force to these protestations. Even in the absence of any promise to marry, a foundation for a claim of seduction is well laid in this record. The express desire and promise of marriage gave color of truth and honesty to his professions, and tended to disarm the plaintiff, and enable the defendant to scale the ramparts.

Though this express desire for and promise of marriage, under the circumstances, might not be sufficient, in itself, to justify the plaintiff in submitting, yet proof of it was surely competent. It tended to show his sincerity, his good motives in the use of those other seductive arts which, if relied upon, are recognized as supporting a claim of seduc-

tion.  It tended to lead her mind to believe that he was honest in his protestations, and that his love was all that virtuous women dream of love.

On the question of a promise of marriage as an inducement, see *Hawk v. Harris,* 112 Iowa 543, 547.  See, also, *People v. Weinstock,* 140 N. Y. Supp. 453.

On the question of an alleged rape, followed by seduction, see *Castleberry v. State,* 21 Ga. App. 69 (94 S. E. 269), in which the court said:

"Even if she had consented to the first sexual intercourse solely because of fear of bodily harm, which would have amounted to a rape, and he, afterwards, by persuasion and promises of marriage, obtained her free consent to have intercourse with him, and thus seduced her, he would be guilty of the crime of seduction."

We next consider the fourth error complained of: that the court erred in giving the eleventh instruction.  This instruction told the jury:

2. SEDUCTION: promise of marriage by a married man.
"The promise of the defendant to marry the plaintiff when he should obtain a decree of divorce from his then wife, would not be a promise to marry which of itself would warrant the plaintiff in submitting to sexual intercourse with the defendant; for an agreement under such circumstances is against public policy; *but such promise to marry, if any such was made by the defendant, may be considered by you together with all the other evidence in the case bearing thereon, for what you may deem it entitled on the question of the relations of the parties, in determining the question as to whether the plaintiff was or was not seduced by the defendant."*

What we have already said disposes of this question.  The portion of the instruction objected to is italicized by us.

The fifth error relates to the action of the court in overruling the objection of the defendant to certain exhibits offered by the plaintiff on the trial.  The defendant's son was

called as a witness in his behalf, and his evidence tends to show that he had heard or had seen the plaintiff visiting his father's room; that she would get up early in the morning, with her shoes in her hand, and, before going down into the living room, would enter his father's room and remain with him some time; and that this frequently occurred. This boy was interrogated as to whether or not he had not made different statements out of court than that to which he had testified, and had not said that he heard his father going to the room of the plaintiff, instead of having heard the plaintiff going to the room of his father. He denied this, and denied that he had ever made any such statements. Mr. Howard, who was attorney for the defendant's wife in her divorce proceedings, was called to impeach this boy. He claimed to have interrogated this boy, touching his father's conduct, and said that the boy had stated to him, and he had reduced the statement to writing, that he had heard his father frequently visiting the plaintiff's room in the morning, and about the times when he testifies on the trial that plaintiff visited his father's room. Without objection, Mr. Howard was permitted to detail what the boy said. This, of course, was simply impeaching testimony, and offered as such. After this evidence was all in, the plaintiff offered the memorandum taken by Mr. Howard, and the defendant objected to it. The court overruled the objection, and plaintiff's counsel started to read the same to the jury. He had not proceeded far, when the court stopped him, and counsel then said that he would withdraw his offer of the exhibit, and the court admonished the jury that the exhibit was withdrawn, and defendant's objection sustained, and that it was not for their consideration; and told the jury that any portion of the exhibit read to them should not be considered by them as evidence at all. Nothing further was done. Every fact that this exhibit contained was detailed by Mr. Howard to the jury, when on the witness stand. He said that his statements were made after refreshing his memory from this exhibit. The exhibit never went to the jury. The jury was admonished not to

3. APPEAL AND ERROR: harmless error: withdrawing improper exhibit.

consider it.  Of course, the court erred in at first overruling
defendant's objection.  That objection should have been
sustained; but no prejudice resulted to the defendant be-
cause, before the exhibit was read to the jury, the offer was
withdrawn, and the court admonished the jury that it
should not be considered by them in any way as having pro-
bative force upon the issues tendered.  We cannot see how
there could be any possible prejudice to the defendant in
what was done.  Indeed, we think that the record negatives
the thought that any prejudice resulted to the defendant
from the action of the court.  Error, to be reversible, must
be prejudicial, and we see no prejudice here.

It is next contended that, after the plaintiff had rested,
and after a motion for a directed verdict was made by the
defendant, the court gave the plaintiff leave to introduce fur-
ther testimony.  It seems to be the thought
4. TRIAL: be-   of counsel that, at the time the motion was
lated opening
of case for     made, it was good, and would have been
additional
testimony.      sustained by the court; that the plaintiff was
permitted to introduce new matter there-
after, and to build a case that she had not made at the time
the motion was made; and that leading and suggestive ques-
tions were asked the plaintiff by her counsel.  The leave to
introduce testimony after a motion for a directed verdict,
rests in the sound discretion of the court, and, unless abused,
will not be interfered with.  When it clearly appears that
it was in the interests of justice, it will never be interfered
with.

We have read the record made, and do not find the defend-
ant's claim sustained in any of the matters urged as preju-
dicial.  The questions were not leading or suggestive.  The
fact is that every matter inquired about at this time had
been testified to by the plaintiff before.  The examination of
plaintiff after this motion simply emphasized and made
plainer some portions of plaintiff's testimony that had come
in so mingled with other matters that it was difficult to say,
perhaps, whether the plaintiff was relying upon the promise
of marriage exclusively, as a basis for recovery.  The ques-

tions propounded at this time made it plain that her testimony could not bear the construction placed upon it by the defendant in his motion for a directed verdict.

We can see no ground for interfering here with the action of the court.

We do not find it specifically urged in the assignment of errors or in the brief points that the verdict is excessive.

A verdict for plaintiff on this third count has support in the evidence.

We find no ground for reversing the case on account of any matters urged by the defendant, either in his assignment of error or brief points. The case, therefore, must be and is—*Affirmed*.

WEAVER, C. J., LADD and STEVENS, JJ., concur.