SEAWELL, J.
 

 Mary Louise Carter, a minor under the age of eighteen years and not the wife of defendant, by an action prosecuted in the name of her guardian
 
 ad litem
 
 against defendant-appellant, Jerry Murphy, was awarded a judgment against him in the sum of $10,000 by the Superior Court of the County of Los Angeles, sitting without a jury, on account of several alleged acts of seduction committed by him upon the body of said minor.
 

 The complaint alleges four specific acts of sexual intercourse, committed in the city of Los Angeles, in the following order: On or about September 8,1935; on or about September 15, 1935; on or about February 14, 1936; on or about April 8,1936.
 

 The defendant, without making any objection by demurrer or otherwise as to the sufficiency of the complaint or as to its infirmity in any particular, filed a verified answer in which he admitted the place of residence of the parties to the action and summarily disposed of all other allegations of the complaint by denying generally and specifically each and every allegation not otherwise expressly admitted or denied by his answer. Called as an adverse party (Code Civ. Proc., sec. 2055) he testified—contrary to the denials of his verified answer—to a number of acts of sexual intercourse committed with said plaintiff under guardianship, but was guarded as to any admission that would fix the times of intercourse prior to October 28, 1935, that being the day on which said Mary Carter arrived at the age of eighteen years. An admission on his part of the commission of any act of intercourse with Mary Carter prior to October 28, 1935, would have been an admission that he was guilty of the crime of rape. (Pen. Code, sec. 261.)
 

 So much of the evidence is interwoven into our review of the sexual relations which existed between defendant and Mary Carter from the time he first met her to and including the month she became pregnant, to wit, April, 1936, and latterly the abortion committed to relieve her pregnancy,
 
 *550
 
 as we deem necessary to support the findings, and in turn, the judgment.
 

 Defendant, a married man, thirty-three years of age, was a traveling salesman in the employ of the Standard Brands of California, a supply concern which had offices in the city of Los, Angeles. At all times material to the action it is alleged that by employing and resorting to artful and deceptive methods, seductive blandishments and amorous and passionate appeals, the defendant accomplished his sexual desires.
 

 Plaintiff, under guardianship, as shown by the birth certificate, was born at Glendale, county of Maricopa, state of Arizona, "October 28, 1917. She resided with her parents near the town or city of her birth which, no doubt, was a rural community, where she attended school. During the summer vacations of the school she visited Mrs. Irene Brooks, a married sister, at Los Angeles, first in 1934, and again in 1935. Her sister was conducting a beauty parlor in said city and lived in an apartment. Mary Carter met the defendant on the occasion of her first visit with her sister, but nothing of an amorous character is mentioned in the evidence as to the defendant’s conduct toward Mary on her first visit. Defendant and Irene Brooks seemed to have been on friendly terms to the extent that he commonly addressed her as Irene. In fact "he signed as her surety on one occasion, in the sum of $100 on the purchase of a sealskin coat. The obligation was afterwards discharged by her without financial loss to him. Mary’s visits with her sister were during the summer vacation months, June, July and August, 1934, 1935. It was her plan upon completing her visit in 1935 to return to her home and enter the Arizona State College to complete her educational course. During her stay in Los Angeles Mary had rooms at her sister’s apartment. By his admissions defendant frequently took Mrs. Irene Brooks and Mary to cafes for lunch and dinners and to places of entertainment. His attentions soon centered on Mary. Irene’s business kept her occupied during the day and into the evenings. His method of contracting Mary was by phone calls at thé sister’s shop or at her apartment. He also called in person at her apartment during the sister’s absence. His method of contact was suited to the exigencies of the situation. The first act of intercourse was accom
 
 *551
 
 plished by defendant at plaintiff’s apartment in August, 1935, shortly prior to the time when Mary was about to return to her home in Arizona to resume her scholastic career.
 

 Mary’s account of defendant’s advances which led to the accomplishment of defendant’s purpose is given in words and circumstances which bespeak remorseful consciousness caused by her deviation from the path of moral rectitude and the bitter humiliation which the shame of illegitimate pregnancy must bring to a young woman just emerging from girlhood into womanhood. There is not a word in the record that tends to show immoral propensities on the part of plaintiff under guardianship, or that she was unduly wayward, or was lacking in moral propriety or refinement, before she ■was beguiled by the blandishments of defendant. There is no reason to discredit the testimony of plaintiff to the effect that during her three months’ vacation in Los Angeles the defendant insinuated himself into her affection by professions of love of her, and by fervid appeals that he “must have her and he could not do without her”. Failing in his efforts to dissuade her from returning to school he requested her to spend her Christmas vacation at Los Angeles. He assured her that he would greatly miss her and asked her if he might write to her and visit her when and if he should go to Arizona, which he occasionally did. He had come to her apartments, he told her, to bid her good-bye. On the eve of departure she yielded to his amorous embrace. She testified that it was not without reluctance on her part but she had come to love him and her resistance was so weakened by his professions that she was unable to withstand his amorous advances. This first act of intercourse was committed late in August and on the next day, Saturday, she left for her Arizona home. She did not reenter school as her affections for him and the lustful passions aroused by her first act of intercourse impelled her to return to him about September 8th or 9th, after an absence of two weeks. Upon her return defendant called her by phone at her sister’s shop and took her to lunch and after taking her on a ride in his automobile he took her to her sister’s apartment and again had sexual intercourse. He took with him a bottle of liquor. Both took a drink or two or three at the apartment. He kissed her, made love to her and said he couldn’t do without her. When she hesitated to readily submit herself to him
 
 *552
 
 lie said: “When people cared for each other it wasn’t wrong”.
 

 The defendant upon his examination expressed himself as entertaining perverted notions as to the personal relations which, in cases of mutual love, might properly exist between the sexes. In mitigation of his conduct, and in line with his moral conception he said he had thought, and still thought a great deal of Mary but her sister was trying to commercialize on something that was “decent”. When asked to explain what he meant by “decent”, his answer was that “as far as the way Mary Carter and I had sexual intercourse was just something that happens between people every day”. He said she knew that he was married. He denied that he told her that he loved her. Mary testified that he told her that his wife was his senior in years and that he respected her but he did not love her; that defendant made no specific statement which she could recall that he would marry her but he asked her if she could live on $250 per month, and by his treatment and conduct he led her to believe that he loved her and intended to possess her as his wife and companion. She believed his professions of love which she took to be sincere, and she became reciprocally enamored of him.
 

 He had intercourse with her again on a date which she fixed as being about September 15th. The defendant came to her apartment at about 7 o’clock and again had intercourse with her. She drank no intoxicating liquor. Mrs. Ebba Holmberg,. a draft clerk with the General Insurance Company of America, and a close friend of Irene Brooks, came to the Brooks’ apartment at about 7:30 P.M., and rang the door bell but met with no response. She then went to the side bedroom window, called Mary and tapped on the window. Mary answered that she would open the door in a moment. Upon looking through the window she observed Mary rearranging her wearing apparel. Defendant was not fully attired as he went from the bedroom into the bathroom. Mary seemed confused by the unexpected call of her sister’s friend. Her disordered appearance and defendant’s presence made Miss Holmberg apprehensive as to proprieties of the situation. Defendant’s manner indicated that he was somewhat affected by the use of intoxicating liquor. This act of intercourse as testified to by plaintiff and corroborated by Miss Holmberg’s testimony would be sufficient to convict
 
 *553
 
 the defendant of the crime of rape as plaintiff was then under eighteen years of age. The defendant denied that he had intercourse on the day named by said witnesses but admitted acts of intercourse were committed a short time thereafter. Miss Holmberg did not mention what she had seen to the sister until she was afterwards told by Irene that Mary and the defendant had stayed together all night at a Los Angeles hotel.
 

 Successive acts of intercourse on defendant’s admissions took place at psuedo hotels, or at questionable hostelries, in which the occupants of rooms were not required to register. The defendant’s duties as traveling salesman frequently took him into various cities and communities in southern California, and often a few days would pass when he did not meet plaintiff. Upon his return to the city he resumed his prior relations with her. At all times he knew that she was a school-girl. When he first met her she was not seventeen years of age. He testified that he never asked plaintiff her age but he had a recollection that she told him on her birthday, which was October 28, 1935, that she had arrived at her eighteenth birthday. His course of illicit relations, according to his admission, began a few days after her birthday, about November 5th. From that day forward, he admitted that acts of sexual intercourse with plaintiff continued until interrupted by pregnancy which developed some time in April or May of the following year, 1936. When defendant was informed by Mary that a physician had pronounced her pregnant and that she had left her sister’s apartment and was then stopping at a hotel, he told her that he would help “her to get out”. He procured a prescription from a “friend”, and brought to her a bottle containing liquid with written directions as to its internal use. This much is admitted by defendant. The plaintiff gave a more extended account of the defendant’s active participation in the effort to relieve her of pregnancy. Briefly, she testified that when she called upon defendant and told him she was pregnant he asked her what the doctor had said. He assisted her in taking the medicine which he brought and told her that if it didn’t do the work she would have to try something else. Plaintiff, prior to this time, had procured a position with the telephone company. During three or four days after she had taken the medicine furnished her she was
 
 *554
 
 ill and unable to work. She then consulted a doctor and an operation was performed which relieved the pregnancy. The doctor who performed it was undoubtedly an abortionist as she did not see his face, which, in such cases, is usually masked or hidden from the patient by some means to prevent identification. Nurses are the usual mediums of visual contact. Plaintiff’s health was impaired by the operation to the extent that she became unable to perform her duties.
 

 The effort made by this defendant to excuse his course of salacious conduct with a school-girl approximately one-half his age, on the ground that he had on certain occasions voluntarily drunk to an excessive degree presents a startling defense. He testified that on one or two occasions at least, after taking her to rooms for the purpose of having intercourse, he was not certain whether he had had intercourse or not, but upon being pressed for a definite answer he admitted that he did have intercourse. The evidence fully sustains the findings of the court that he was guilty of seduction. The only conclusion deducible from his testimony, is that he did not love plaintiff and he had no intention or expectation of setting aside his wife and ultimately marrying her, but that he deliberately planned by sedulous methods the undoing of an unsophisticated school-girl in order to satisfy his carnal and lustful passions.
 

 There can be no doubt that the defendant used every means and influence at his command to beguile plaintiff into the commission of the irremediable error which neither regrets nor sorrow can blot from her memory. Whatever the true relations may have been that existed between Mrs. Irene Brooks and defendant are not told by the record. But, if for purposes of example, it should be conceded that they were meretricious—both being married persons—the continuous secret meetings planned by the defendant with her youthful sister, who came in her school years from a respectable home, shows a lack of respect for the moral code which is indefensible. There is no evidence whatsoever that the sister encouraged, or had any knowledge of the existence of any immoral relations between her sister and defendant.
 

 The testimony of Mary is clear and convincing, and in several particulars, is corroborated by another witness, by unimpeachable circumstance and by the admissions of the defendant. She did not attempt to recite all of the terms of
 
 *555
 
 endearment employed by the defendant or describe the artful and subtle means by which the seducer may transport his youthful victim into a state of sexual excitation, whereby the will of the one is brought under subjugation of the other. Words are not adequate to describe the mental emotions and physical conduct of persons whose relations are such as shown by the record before us.
 

 An attempt was made to show that plaintiff was a person of previous unchaste character. Defendant, during his examination, introduced into the case an episode to the effect that on one occasion he appeared at Mrs. Brooks apartment, at an unseemly hour, intoxicated, and because of his inebriated condition, he was permitted to occupy a bed for the balance of the night. His testimony to the effect that he occupied a bed with both Mrs. Brooks and Mary and when he awoke later in the morning he found Mary in his bed but he was too far under the influence of liquor to know if he had had improper relations with her, is not persuasive, and doubtless it did not impress the trial judge. The fact that his meetings with plaintiff were clandestinely made and his intrigues were secretly arranged renders his statement improbable. Besides it was refuted.
 

 As a further effort to impeach the previous chaste character of plaintiff, the following questions were put to her and answers given on cross-examination:
 

 “Q. During part of this time, [referring to the period of illicit relations] as I understand it, you were working as a taxi-dancer in a dance hall on Fifth Street? A. One night. Q. One night? A. Yes, sir. Q. That is the only time you ever worked there? A. Yes, sir.”
 

 The subject was here dropped.
 

 No act which tended in the slightest degree to reflect on plaintiff’s character, prior to meeting the defendant, was hinted at during the trial. Both of the above incidents introduced into the case were subsequent to the time when plaintiff came under the influence and domination of the defendant, and, even if true, the defendant would not be permitted to take advantage of his own wrongful acts. In the instant case, the alleged particular immoral act which defendant seeks to turn to his advantage is but the continuance of the relations which were initiated by him in the circumstances herein set forth. The incident, if true, would serve well to emphasize the moral degeneracy and the far-
 
 *556
 
 reaching consequences of which the initial sexual act was the primal cause.
 

 The action is prosecuted by virtue of the following provisions of section 374, Code of Civil Procedure of this state:
 

 “374. An unmarried female may prosecute, as plaintiff, an action for her own seduction, and may recover therein such damages, pecuniary or exemplary, as are assessed in her favor.”
 

 A jury having been expressly waived, the court awarded the plaintiff a judgment in the sum of $10,000. The defendant has devoted the greater part of his argument to an effort to overthrow the judgment of the trial court holding him liable on the action for seduction. The acts offered to prove sexual intercourse, it is vigorously contended, even as detailed by the testimony of the plaintiff herself, giving due consideration to the inferences and deductions as are warranted by the facts proved or as are warranted from a consideration of the propensities and passions of the defendant as disclosed by the evidence (sections 1958, 1960, Code of Civil Procedure), considered either singly or altogether, are not legally sufficient to constitute an action for seduction.
 

 The case upon which appellant most strongly relies and to which frequent references are made and extended excerpts are taken, is
 
 Breon
 
 v.
 
 Hinkle,
 
 14 Or. 494 [13 Pac. 289]. The Oregon Supreme Court then consisted of three members. Chief Justice Lord and Associate Justices Thayer and Strahan, Justice Thayer writing the opinion. Justice Strahan specially concurred in the order of reversal on the ground that certain instructions given at the request of respondents were correct as abstract propositions of law, but in the justice’s opinion they had no application to any facts which the evidence tended to prove, and being mere abstract propositions of law were, in the facts of the case, misleading. Chief Justice Lord said in a general way, there were many things said in Justice Thayer’s opinion (without specially designating any one) to which he assented, but inasmuch as the matter was before the court on a bill of exceptions and it was not stated therein that the bill of exceptions contained
 
 all
 
 the evidence, therefore under the long approved rule, it must be presumed that the instructions were warranted by the evidence, and no reversible error was committed by the court, since, of course, the instructions set forth a correct exposition of the law of seduction. Said action was prose
 
 *557
 
 cuted under section 35, Civil Code of the state of Oregon, which provides that an “unmarried female over 21 years of age may maintain an action as plaintiff for her own seduction, and recover therein such damages as may be assessed in her favor; but the prosecution of an action to judgment by the father, mother, or guardian as presented in section 34, Civil Code, shall be a bar to an action by such unmarried female”. It will be observed that the Oregon statute differs from our section 374, Code of Civil Procedure.
 

 It was because of deference to the common-law rule, influenced by the particular phrasing of the statute, that the author of the opinion manifested a leaning to the common law which limited the recovery in cases of illicit sexual intercourse resulting in pregnancy to the actual pecuniary loss sustained. In yielding to a construction of the statute which extended the ancient rule limiting the right of recovery to the loss of services sustained by parent or master, to include damages on account of mental anguish and loss of reputation and character suffered by the injured female, the author of the main opinion, undoubtedly incensed at the bold and iniquitous attempt of the plaintiff to convert pretended virtue into a thing of profit, entered into a lengthy disquisition on the subject of seduction both as to its legal and moral aspects in which neither of his two associates were willing to follow him the entire distance. One dissented and the third specially concurred. The divergent views of the court arose from the giving of an instruction held to be a correct general statement of the law of seduction but inapplicable to the case, there being no evidence to support certain assumed facts incorporated in the instruction. The assumption of said facts being deemed prejudicially misleading, it was held reversible error to give it. It reads:
 

 “Seduction is the wrong of inducing a female to consent to unlawful intercourse by enticement and persuasions overcoming her reluctance and scruples. There must be reluctance on the woman’s part to commit the act, and her consent must be obtained by flattery, false promises, artifice, urgent importunity based on professions of attachment, or the like. Otherwise there is no seduction in the proper sense of the word. Sexual intercourse accomplished by means of a promise of marriage is seduction. Therefore, if you shall find that the defendant did, through enticement or persuasion, or by artifice, urgent importunity based on profession of at
 
 *558
 
 taehment, or by promise of marriage, or the like, overcome the plaintiff’s reluctance and scruples, and thereby induced her to have unlawful intercourse with him, then you should find for the plaintiff, and assess her damages. ’ ’
 

 The authors of the main and concurring opinions were of the view that there was no evidence before the jury of any enticement, persuasion, artifice or urgent importunity based on professions of attachment and therefore the court erred in charging the jury in an abstract manner that they had a right to consider any of the aforementioned propositions in determining whether defendant had committed seduction. The chief justice dissented from the order of reversal, the instructions in his view being a sound exposition of the law and inasmuch as the bill of exceptions did not negative the assumption that no such evidence was adduced at the trial, and the law was correctly stated, error could not be presumed. It will require but brief references to the opinions in the case to make plain the wide factual differences which exist between the instant and the cited ease. We have sufficiently described plaintiff’s status in the instant case as a school-girl of previous chaste character, under the age of eighteen years, and a resident of a neighboring state, who was visiting her sister at the time the seduction was committed.
 

 The plaintiff in the Breon case, upon which the defendant herein relies, was a woman twenty-eight years of age, had been twice married, and twice divorced, and was the mother of a child by each of her former husbands. The° alleged seduction took place in plaintiff’s room at the Palace Lodging-house. She met the defendant some three months before he had intercourse with her. He called at her room on her invitation. Her narrative of what followed, as summarized in the opinion is, that on the occasion in question, after some discussion he went out and brought in some beer. Both drank, plaintiff drinking very little. Immediately after drinking the beer defendant grabbed her and a struggle ensued. She protested and fought until she became exhausted. During the struggle he promised to marry her and he made “every promise”. She still refused and he had intercourse with her by violence. She begged him not to make so much noise as the other rooms in the house were occupied and the noise would attract the attention of the persons who occupied them. Defendant remained in the room for some time and again had carnal knowledge of her, the circumstances of
 
 *559
 
 which she did not recollect. He spent the next evening with her but nothing improper happened. Their relations came to a close. She became pregnant following said acts of intercourse and was delivered of a child. The defendant testified that on the morning following said acts of sexual intercourse he gave plaintiff $20. The plaintiff testified that some time thereafter he gave her $20 or $30. The authors of the main and concurring opinions were manifestly of the opinion that the testimony of plaintiff was too improbable and insufficient to support the judgment as both bear heavily upon the plaintiff’s statement that during the struggle in which she was overcome by violence she begged the defendant not to make so much noise as it would attract the attention of those in the other rooms. The further fact that plaintiff’s acquaintance with defendant was of brief duration, and that she was a mature woman with maternal and worldly experience stand out as potent negations of her claim that she was “tempted, allured and led astray from the path of virtue, through the influence of some means of persuasion employed by the man, (defendant) until she freely consented to the sexual intercourse”, or that she was overcome by physical violence. The main opinion characterizes her as “a female
 
 a long way from girlhood”.
 

 If plaintiff entered into an unlawful act of sexual intercourse freely and voluntarily, and without the employment on the part of the accused of any art, promise, deception, persuasion or the exercise of any
 
 undue influence
 
 over the alleged seducee, which was calculated to overcome her reluctance and scruples, plaintiff would not, under the foregoing observation, have a cause of action for the damage suffered by her, and the act thus voluntarily entered into would not amount to seduction.
 

 The Breon case does not change the definition of the term seduction, used in its legal sense, in the slightest respect from the definition given by standard authors and the' best considered cases treating of the subject as will hereafter appear. The
 
 facts
 
 of the instant ease bring the ease well within the meaning of the term as defined by-the three separate opinions of a court consisting of three members, in which one justice concurred in the judgment of reversal on the sole ground that the evidence did not justify the giving of an instruction admitted to be correct as an abstract proposition of law, but which may have led the jury into the belief that the elements
 
 *560
 
 necessary to constitute the offense, as set forth in the instructions, had been proved. The third justice dissented generally.
 

 Appellant has cited other cases in which the evidence adduced at the trial was held insufficient to sustain judgments for unlawful sexual intercourse, the leading one being
 
 Baird
 
 v.
 
 Boehner,
 
 72 Iowa, 318 [33 N. W. 694], decided in 1887, as being factually similar to the instant case. The plaintiff in that case was a school teacher, twenty-five years of age. She and defendant had engaged in acts of sexual intercourse from July, 1882, to August of that year. She testified that partly with the determination of reforming her ways she withdrew from her former environment and went to Kansas, in September, 1882, where she remained for a period of six months. Two days after she returned to her home she went on a buggy ride with defendant and they again engaged in intercourse. This relationship continued until December, 1883, She finally became pregnant, and brought an action alleging seduction. She was a mature woman engaged in training the minds and developing the moral character of youths. There is no factual resemblance between the two cases. In the cited case there was no sufficient evidence tending to show that a false promise was made or deceit or artifice was practiced to allure plaintiff from the path of virtue, but in the circumstance of her station her lapse must be attributable to “indiscretion in permitting the intercourse to take place”. It would be a harsh and unjust decree of the moral law that would apply the same rule of accountability to the youthful plaintiff in the instant case as might properly be applied in the ease of mature womanhood. There is also this additional element present in the instant case which does not appear in the cited ease. Appellant professed close friendship with plaintiff’s sister but notwithstanding this relationship it was with a member of her household, in the home, which should be as a fortress of protection in which virtue is secure against alluring temptations, that plaintiff’s virtue was violated. The particular relationship that existed between the parties is an important element in determining the question of seduction.
 
 (De Haven
 
 v.
 
 Helvie,
 
 126 Ind. 82 [25 N. E. 874].)
 

 Appellant has cited eases of other states which held the evidence adduced was not sufficient to sustain a seduction judgment. We have examined the eases so holding and find
 
 *561
 
 none of them fairly comparable in culpable conduct to the instant case.
 

 Both parties cite a case of this court,
 
 Marshall
 
 V.
 
 Taylor,
 
 98 Cal. 55 [32 Pac. 867, 35 Am. St. Rep. 144], decided six years after
 
 Breon
 
 v.
 
 Hinkle,
 
 and
 
 Baird
 
 v.
 
 Boehner, supra,
 
 were in the books. The general facts recited in the opinion are that defendant was a man of mature years, owned large property interests, was married and residing with his family. The plaintiff was an employee of defendant, engaged as a Avaitress at the hotel kept by defendant. She was of the age of sixteen years and ten months, had seen considerable of the world, having resided with her mother in various localities and was an intelligent girl for her years. The proof of seduction rested alone with the testimony of plaintiff. The defendant squarely contradicted plaintiff’s evidence in every essential particular. The plaintiff’s testimony was that the defendant had called upon her once before at her room in a cottage near the hotel and brought her some books. On the evening in question, he conversed with her and asked her if she ever drank any wine. He handed her a glass of Avine which she drank. He poured out a glass for himself, tasted it and said it was too sweet. Plaintiff testified that very soon after drinking the wine her head commenced to go around and she had tingling sensations and became sick at the stomach. She said that her limbs felt hea-vy and numb. She described the sensations which she experienced as being peculiar and such as she had never experienced before. She arose and defendant helped her to the bed. She asked him to go away. He kissed her and told her he loved her, and assured her that he would always be her friend; that he had plenty of means and she would never want. She then yielded. She said she had no distinct recollection of what occurred after she was laid upon the bed until she felt pain. Plaintiff thereafter gave birth to a child. In an action for damages for seduction she was awarded the sum of $25,000.
 

 The instruction given and the court’s discussion of the law and the particular situation presented by the facts of that case are singularly applicable to the facts of the instant ease with the exception that there is no direct evidence that plaintiff here was affected by liquor to the degree that plaintiff claimed she was affected by drinking one glass of wine in the cited case. All other elements germane to the subject are made the subject of discussion. We quote:
 

 
 *562
 
 “ ‘The word “seduction”, when applied to the conduct of a man toward a female, means the use of some influence, promise, art, or means on his part, by which he induces the woman to surrender her chastity and her virtue to his embraces. There must be something more than a mere reluctance on the part of the woman to commit the act, and her consent must be obtained by flattery, false promises, artifice, urgent importunity, based on professions of attachment, or the like, for the woman, and that relying solely on said promises or professions of flattery or artifice or importunity, she surrendered her person and chastity to her alleged seducer. And that relying and being influenced solely by such promises, flattery, artifice, and urgent importunity, she then being chaste, surrendered her person and chastity to her alleged seducer. ’ After a careful examination of many cases, we are satisfied the law is fairly declared in the foregoing instruction, and that such instruction is in line with the authorities in this country.
 
 (State
 
 v.
 
 Bierce,
 
 27 Conn. 319;
 
 Croghan
 
 v.
 
 State,
 
 22 Wis. 444;
 
 Brown
 
 v.
 
 Kingsley,
 
 38 Iowa, 220, 222.) Modern lexicographers define seduction as the act of persuading a woman to surrender her chastity. In its ordinary acceptation it implies a betrayal of confidence, and for that reason a great majority of this class of .cases are based upon a violated promise of marriage, but this is not a universal rule by any means; for a married man may seduce a girl, and that, too, though she is aware of his marriage. There are many cases to this effect, but they have arisen generally where the injured parties being young girls and easily beguiled could not be held to the plane of responsibility occupied by women possessing a wider knowledge of the world.
 

 “In the present case we have a chaste girl, not seventeen years of age, making her living far distant from her few friends, stopping at night alone in a cottage. She is visited after dark by her employer, with whom she was upon friendly terms, a man of wealth and years. After a conversation upon ordinary topics, lasting some time, he gives her a glass of wine which she drinks, and her mind is seriously affected thereby. He expresses affection for her, repeatedly caresses her, makes promises of future friendship and assistance, and after all these things have been going on for some length of time he seduces her; at least a recital of
 
 *563
 
 these events would picture a case of seduction to the ordinary mind. They do not disclose a cold, deliberate transfer of virtue for a consideration. Neither do they describe a sacrifice of virtue to the demands of lustful passion; but the blandishments, the expressions of friendship, the promises, the wine, weapons of the seducer, were all there. If the plaintiff were a woman of years, with that knowledge of the world which age brings with it at the present day, the case might present a different aspect. The struggle would not have been so unequal, and she would have been held to a stricter responsibility. But we cannot charge her with that judgment and discretion which come only with age and experience. The drinking of the wine seriously affected her, and its administration alone may be well termed an artifice that conduced to her downfall. If these things which she has said be true, and the jury has so found the facts, her cause of action is supported by the evidence. ’'
 

 The word “seduction” when used with reference to the conduct of a man toward a female, has a precise and determinate signification. The accepted definition is fully stated in 57 Corpus Juris, page 10, supported by many citations of cases, as follows: “Thus the word ‘seduce’ in its common as well as legal acceptance, imports the idea of illicit intercourse, accomplished by arts, promises, or deception ; the wrong of inducing a female by enticements and persuasions overcoming her reluctance and scruples; the use of arts, persuasions or wiles to overcome the resistance of a female who is not disposed of her own volition to step aside from the paths of virtue.” (See, also, 24 B. C. L., sections 3-10, pages 732-738 and cases cited.) In some eases the words “urgent importunity” are used instead of “persuasion”. Considered with respect to the context both terms express the same meaning.
 

 The evidence clearly supports the finding of the trial court that the acts of the defendant are within the definition and meaning of the word “seduction” as judicially defined. Moreover, if the defendant committed the acts of intercourse as charged at a time when plaintiff was under the age of eighteen years, the fact that in so doing he also committed the crime of rape, would not exempt him from liability in an action charging seduction even though the acts charged were perpetrated without regard to any of the means necessary to make out a case of seduction. “The fact that defendant
 
 *564
 
 has committed the offense of rape, as well as seduction, only aggravates the latter injury and furnishes ground for exemplary damages.” (24 R. C. L., sec. 4, p. 734;
 
 Marshall
 
 v.
 
 Taylor, supra;
 
 57 Cor. Jur., p. 14, and supporting eases.)
 

 Appellant has devoted considerable space in his brief to supporting certain observations made by Justice Thayer setting forth his personal views as to the degree and kind of proof that should be required to substantiate a charge of seduction. The reasons given in justification of a departure from settled judicial pronouncements, and in some cases statutory regulations, are: “The individuality of the female sex has been advanced during the past few years. Their knowledge of the world has been greatly improved, and their 'legal capacity enlarged. The notion that they belong to the weaker sex is only entertained by the credulous and unsophisticated. They are not easily beguiled, and should be held to a reasonable responsibility; and if allowed to maintain an action for their own seduction, and demand a large compensation for their loss of character, should be required to prove something-more than mere importunity as the means through which it was accomplished. I have but little faith in the merits of such a law.” He concludes his views on the subject divining that the law, unless interpreted to meet his views, will be resorted to more frequently by the unscrupulous than by the more womanly “who would be inclined to smother their disappointment and grieve over the wrong, while the unscrupulous would make it a matter of public parade and profit”. It is further stated that the radio, moving pictures, the widened field of female activities and widespread dissemination of information with reference to sexual relations have given the womanhood of today a better understanding of the moral duty that should guide their relations with men than existed when the Breon ease was written fifty years ago. Whether the inventions, creations, the startling developments of science and the entry into broader fields of social and political activity have had or should have had the effect of quickening moral responsibility and duty or have made it easier for the sex to conquer human emotions and passions or have hedged in female chastity with walls of protection which did not heretofore exist, are questions affecting public morals of which legislatures may take cognizance. There has never been a time in the history of the civilizations which observe
 
 *565
 
 a moral code, that the female sex has been in ignorance as to the magnitude of the misery and ruin which unlawful seduction inflicts upon transgressors. This age-old sin has been the concern of motherhood since the earliest civilizations and daughters in early girlhood in the ages past have not been ignorant as to its inexorable penalties.
 

 It may be observed further that notwithstanding our intellectual advancements there have been more statutes enacted for the protection of the morals of youth since the Breon decision (1887) than were in our statutes at the time it was written. In fact the legislature in defining rape has since that day raised the age of consent of the female from sixteen years to eighteen years, thereby making voluntary intercourse with a female under that age rape. Many laws designed to protect female chastity and the morals of the 3ouths have been enacted notwithstanding the marvelous intellectual advancements made during the past half century.
 

 If the arguments of appellant rest upon sound moral grounds they should be addressed to the law-making branch of government rather than to the judicial branch.
 

 The complaint contains ten paragraphs numbered in numerical sequence. The findings refer to the paragraphs in their numerical order and find each to be true as alleged in the complaint except as to Number IX which alleges general damages in the sum of $50,000. The corresponding finding reduced that amount to the sum of $10,000. The prayer of complainant was for the further sum of $10,000 by way of exemplary damages.
 

 Several exceptions are taken to the findings based on the contention that certain of them are not wholly supported by the evidence, and the court improperly included them in computing the amount which it found would fairly compensate for the damages suffered by plaintiff. One of the grounds of objection is based on allegations contained in paragraph X of the complaint, on information and belief, to the effect that the defendant was a man of wealth and was well able to pay for the irreparable damage done plaintiff. No evidence was tendered by plaintiff which in any way related to the defendant’s financial standing, except incidentally, the testimony of plaintiff that the defendant during a period of amative relations asked her if she could live on $250 per month. The defendant was examined by his attorney as to his financial ability and he said his salary as
 
 *566
 
 traveling salesman was $225 per month and that was his only source of income and he owned no property of any kind except an equity in his household furniture. The inquiry went no further.
 

 An examination of the findings as a whole makes it very certain that the court did not consider the financial standing of the defendant in forming its judgment as the findings, by specific reference, were unquestionably based on general damages and nothing was allowed by way of exemplary damages or special damages as to which there were no allegations or proof as to the amount. The few references made to the necessity of obtaining the services of a physician to relieve the pregnancy which defendant admitted he aided and abetted by furnishing medicine, were merely recitals of conditions which were consequent, or incidental to, and descriptive of the acts charged. The complaint was not framed on the theory that special damages were sought. No demurrer was interposed or motion was made to strike out any part of the complaint on the grounds of uncertainty, irrelevancy or immateriality, or for any other alleged defect. The complaint alleged the first act of sexual intercourse was committed about September 8, 1935. Early at the trial she testified that the first act was committed in August of that year, just as she was on the eve of departure to her parents’ home. That testimony was objected to by defendant and the plaintiff asked leave to amend by including the first act of seduction in her complaint. The trial court took the view that it was not necessary to make the formal amendment and treated the act as an issue in the case. Plaintiff was fully cross-examined by defendant as to this act of intercourse. His point is that if the plaintiff had intercourse prior to the time alleged in the complaint as filed, she was not, on September 8th, 1935, a female of previous chaste character. But the fact is that if she was defiled in August it was by him and no one else. If he did not have intercourse with her in August, but did have such relations later as admitted by him, she was at the time alleged in the complaint, a female of previous chaste character and the pleadings and evidence remain amply sufficient to sustain the judgment. In either event he was the original violator of her chastity.
 

 Lastly, the judgment is attacked on the grounds that it is exorbitantly excessive and a new trial should be ordered. The cause was tried by the court, a jury having been waived.
 
 *567
 
 “As a result of the difficulty in laying down any fixed rule of damages it is generally held that the action for seduction . . . is exempted, by peculiar considerations from the interference of the courts on the ground of excessive damages, and unless, under extraordinary circumstances, as where the verdict is so great as to raise the suspicion of partiality, passion, prejudice or corruption, the finding of the jury wall not be disturbed. Damages are the peculiar province of the jury, and it is their judgment and not that of the court, which is to determine the amount of such damages. Even at common law in this class of eases, verdicts of juries were seldom held to be excessive, even when the parent recovered on the fiction of loss of service, and there has been held to be even less reason for disturbing a verdict when the plaintiff is the woman seduced. ’ ’ The foregoing quotation is taken from 24 Ruling Case Law, page 759, and is buttressed with ample authorities. In the instant case the amount awarded by the judgment was not assessed by a jury’s verdict, but is the result of the trial court’s calm and judicial determination. In such cases we are bound by the judgment.
 

 Judgment affirmed.
 

 Curtis, J., Langdon, J., Waste, C. J., and Houser, J., concurred.
 

 Rehearing denied.