Samuel H. Hofstadter, J.
The plaintiff, Beverly Aadland, an infant now 18 years old, through her court-appointed guardian, has brought this action against the estate of the late Errol Flynn, the well-known motion picture actor, who died on October 14, 1959. The temporary administrators of the estate, one of whom is Flynn’s widow, by motion to dismiss the complaint, challenge the maintainability of the suit in which judgment is asked for $5,000,000.
*834 Against the luridly lighted background which is presented by that pleading, the legal aspect is not obscure. But moral imponderables emerge, also, which are too significant to be ignored. For, as Professor Edmund Cahn recently admonished us, Judges ought not “ to assume that they are entitled to address their judicial opinions exclusively to the eyes and minds of lawyers. ’ ’ And, I may add that in cases of wide public currency, the community — in a true sense, if not in a legal one — is a real party in interest — and concern. The relations of the plaintiff and Flynn have achieved notoriety throughout the land. The mess should not, and in any event, cannot, be swept under the rug.
While we are here necessarily confined to the complaint, that paper unfolds much of the sordid Beverly Aadland-Errol Flynn story-—-at least as the plaintiff conceives it. It tells in great detail how Flynn, the glamorous movie star, led Beverly down the primrose path of dalliance. He is pictured as a lecherous libertine who took advantage of the plaintiff’s youth and immaturity as well as her ambition to make her way in the silver screen world, and her “ longing to be a ‘ star ’ ”. He contrived to meet her in 1957, when both were on the same location in Hollywood, she appearing in a minor capacity as a dancer in one picture while he was filming another. From this meeting an intimacy developed which lasted until Errol Flynn’s death. In essence, the complaint portrays the plaintiff as an impressionable child who fell victim of Flynn’s wiles and through her association with him suffered mental and moral deterioration. It gives a lurid picture of their exciting life together. Yet it places on him alone the responsibility for her downfall and denounces him with appropriate, if repetitive, invective. It tells us, for example, that Flynn “ led her along the by-ways of immorality, accustomed her to a frenzied life of wild parties, subjected her to immoral debauchery and sex orgies * * * and roused within her a lewd, wanton and wayward way of life, and roused within her deep unripened passions and unnatural desires inimical to the interests, welfare and fulfillments of her normal youth ”. At another point it is charged that Flynn ‘1 deprived her of the God-given opportunity of coming into bloom as a normal woman. He robbed her of all the beauty, wonder and joy of her youthful years of normal growth and development ”. And again, “ He created an environment which the only way Beverly Aadland could expand and grow * * * was * * * to conform to Errol Flynn’s overpowering and magnetic demand for a loose and carefree companion who would adopt his unhealthy, unwholesome and perverted phil *835 osophy of wringing every pleasure out of life today regardless of the cost, for there might not he a tomorrow”. The above are a few random quotations — the complaint abounds in others in like vein.
Doubtless, this unfortunate young woman has been victimized— but by whom? (Even during the pendency of this motion, she has been exploited by being paraded at various night clubs for the unwholesome edification of their patrons.) To be sure, Flynn was the immediate occasion for her degradation. But was he the sorcerer’s apprentice who evoked a demon in her — or, was he not himself the issue of an evil spirit-—one of the creatures which ‘1 never remains solitary [because] every demon evokes its counter-demon ” in an endless moral chain reaction? In an ultimate sense, was not Flynn the victim of the deep social contamination? For we live in a climate of physical violence compounded by moral confusion. The drive for power and possession has generated talent without scruple, contesting for ascendancy — of which Flynn was but an egregious exemplar.
In current society, rackets of every variety flourish. The hoodlum empire has infiltrated legitimate enterprises in widely disparate fields. The nether world, in expanding degree, is propelling itself into so-called upper-world, permeating it at almost every strata and becoming so commingled that practically nothing escapes its taint. The infection introduced into the system has produced a generalized peritonitis.
We cannot pause here to explore the wider expanse of this problem. However, in view of the background of Flynn and the plaintiff, we are prompted to observe that the social malaise is especially virulent in the -area of entertainment — television, movies and night clubs. We are not unmindful of the many honorable practitioners of the lively arts. But, unfortunately, by a sort of Gresham’s Law, the bad submerge the good, and the lowest common denominator — pandering to the lowest instincts of the audience — dominates the scene. If one were to judge by their product, crime and sex are the sinister — and almost exclusive preoccupations of the community.
The television studios spew out for profit the most dreadful sound and fury — sadism and violence — over the airways which really belong to the people. It is a sad commentary that 60% of all film series made for television utilize violence and crime as their basic element. Ten thousand hours of crime films are in the program backlog which is available to broadcasters and 9,000 half-hour crime shows are in the syndicated field.* A lead *836 ing psychiatrist, Dr. Frederic Wertham, ruefully notes that we “have silently passed an amendment to the Sixth Commandment : Thou shalt not kill, but it is perfectly all right for you to "enjoy watching other people do it, the more the merrier, and as brutally as possible.”
A significant- portion of the motion picture industry caters to adolescent eroticism. It has vulgarized pornography and has activated an animate indecency in young and old. Others, somewhat more respectable, trade on the lurid and the lewd—and what they cannot show on the screen, insinuate in meretricious advertisement. One such current notice boasts that the protagonist is a “ ferally magnetic young animal ”; another has the abysmal presumption to quote Scripture in an equally obnoxious advertisement. Similarly too many night clubs offer entertainment without talent to titillate the morally obtuse. Many of their comics are ‘ ‘ sick ’ ’ and many of their musicians ‘£ beat ’ ’ or “cool”. Racketeers have sometimes owned “pieces” — aliquot parts — of the entertainers; which is not surprising since some of the managers and owners of these clubs have been sleazy characters; the fronts for and collaborators of mobsters.
Obviously, the frame of reference here is not one of morals or censorship. Essentially, it is one of community decorum. Since, apparently, we cannot reach this malaise by legal sanction only, in the effort to protect the community, we may be required to resort to social ostracism — of those in high places too, who are really responsible and should be held accountable.
Our young people have been misled by the shoddiness and brutality that the entertainment world depicts — and extols. They have been betrayed into accepting such sham standards. Against this background, ‘ ‘ vices are learned without a master ’ ’ and in any event, the instructors cannot be isolated.
To revert, therefore to the immediate: The defendants characterize the claim asserted in this complaint as in substance one for leading a minor astray. The plaintiff, on the other hand, asserts it is for debauchery or corruption. Of course, its enforcibility in a court of law depends on its true nature and not on the nomenclature applied to it.
The defendants argue correctly that at common law, with a single exception not here pertinent, the seduced female had no civil action’for seduction. The common-law action for seduction could only be brought by the girl’s parents (Hamilton v. Lomax, 26 Barb. 615; Furman v. Van Sise, 56 N. Y. 435; see Fearon v. Treanor, 272 N. Y. 268, 271; Barton v. Bee Line, 238 App. Div. 501).
*837 But even if the plaintiff had a cause of action for seduction at common law, it has been abolished in New York by article 2-A of the Civil Practice Act. That article enacted in 1935 declared an important and basically new public policy. So far as here material, it provides:
“ § 61-a. Declaration of public policy of state. The remedies heretofore provided by law for the enforcement of actions based upon alleged alienation of affections, criminal conversation, seduction and breach of contract to marry, having been subjected to grave abuses, causing extreme annoyance, embarrassment, humiliation and pecuniary damage to many persons wholly innocent and free of any wrongdoing, who were merely the victims of circumstances, and such remedies having been exercised by unscrupulous persons for their unjust enrichment, and such remedies having furnished vehicles for the commission or attempted commission of crime and in many cases having resulted in the perpetration of frauds, it is hereby declared as the public policy of the state that the best interests of the people of the state will be served by the abolition of such remedies. Consequently, in the public interest, the necessity for the enactment of this article is' hereby declared as a matter of legislative determination.
“ § 61-b. Certain causes of action hereafter accruing abolished. The rights of action heretofore existing to recover sums of money as damage for the alienation of affections, criminal conversation, seduction, or breach of contract to marry are hereby abolished.”
“ §§ 61-h. Construction of article. This article shall be liberally construed to effectuate the objects and purposes thereof and the public policy of the state as hereby declared.”
The plaintiff seeks to escape the operation of the foregoing statute by calling her action one for debauchery rather than seduction. This move cannot avail her. Admittedly, a cause of action for debauchery in favor of the female who submits herself to it was unknown at common law and has not heretofore been recognized. We may accept the plaintiff’s thesis that novelty alone should not bar a meritorious cause of action. The objection to her claim, however, is not its novelty. It is rather that the Legislature has, through article 2-A of the Civil Practice Act, erected an insuperable barrier to its assertion. No amount of semantic jugglery can alter the plain fact that the thrust of her complaint, whatever its label, falls directly within the purview of the statute. In the face of the legislative mandate that the article is to be liberally construed, the court is not free to cut it down or to limit its scope through verbal niceties *838 such as the plaintiff presses on it here (see Katz v. Katz, 197 Misc. 412; Ruza v. Ruza, 286 App. Div. 767).
The plaintiff asserts a distinction between seduction and debauchery. The former, she says, is confined to the initial surrender of chastity, while the latter connotes repeated or persistent sexual immorality. Though admitting that article 2-A has outlawed the action for seduction, she urges that the law should give a cause of action for debauchery. In other words, the worse her conduct the better her cause of action. If article 2-A can be circumvented so easily, it will have utterly failed of its purpose.
Nor does the plaintiff’s infancy give her a cause of action she would not otherwise have. Since suits at common law for seduction generally arose out of the seduction of a minor, the abolition of article 2-A of the cause of action would be meaningless, unless it extends to all such actions, regardless of the age of the victim.
Article 2-A of the Civil Practice Act expresses the State’s policy towards civil suits founded on conduct and relations such as those recounted in the complaint before us. This policy springs from the conviction, born largely of the evils enumerated in section 61-a of the act, that, if and when wrongs occur in this area, they are to be righted, so far as they can be righted at all, through measures other than the recovery of money damages in a court of law. This court is not free to thwart or impair that policy, even were it not persuaded, as it is, that it is socially sound. Accordingly, the motion is granted and the complaint is dismissed.

 Statistics from the recent survey of the National Association for Better Radio and Television.