Sharon A. BREECE,
Plaintiff-Respondent,

v.

Mishka C. JETT, Defendant-Appellant.

No. 37824.

Missouri Court of Appeals,
St. Louis District,
Division Four.

Aug. 30, 1977.

Francis L. Ruppert, Ruppert & Schlueter, Clayton, for appellant.

Armstrong, Teasdale, Kramer & Vaughan, Edwin S. Fryer, Edwin L. Noel, St. Louis, for respondent.

SIMEONE, Chief Judge.

## I

### Introduction

This is an appeal by defendant-appellant, Mishka C. Jett, from a judgment of the circuit court of St. Louis County entered upon a jury verdict on October 10, 1975, which awarded the plaintiff-respondent, Mrs. Sharon A. Breece, $3,500 actual damages and $3,000 punitive damages on Count I of her petition for seduction under a promise of marriage, and $8,000 actual damages and $2,500 punitive damages on Count II of her petition for the "conversion" of certain tangible property and money which the jury found was owned by or due to Mrs. Breece and which, under given instructions, Mr. Jett refused to return to her.

The defendant, Mr. Jett, filed a counterclaim alleging that Mrs. Breece had converted several items of his personal property and prayed damages therefor. The jury found in favor of the plaintiff on the counterclaim. He does not appeal that issue.

Mr. Jett, the appellant, urges error (1) in the giving of certain instructions on the seduction and "conversion" counts of plaintiff's petition and in the giving of the damage instructions—both actual and punitive, (2) in that the verdict was excessive on Count II and (3) in that the trial court failed to grant his motion for directed verdict on the seduction count at the close of the plaintiff's case and again at the close of all the evidence.

## II

### The Facts

Since the appellant, Mr. Jett, urges that the trial court erred in failing to grant a directed verdict, we must, under the authorities, review the evidence in the light most favorable to the plaintiff and give her the benefit of all reasonable inferences to be drawn therefrom. *Rehg v. Giancola*, 391 S.W.2d 934, 937 (Mo.App.1965).

Sharon A. Breece, age 29 at the time these events occurred, was, in 1973, a secretary in the mathematics department at Florissant Valley Community College. She had been married to Louis Gerald Breece on February 25, 1961 when she was 18 years old. The marriage produced a daughter, Robin, who was approximately 8 years old in 1973. Sharon was divorced from Mr. Breece on February 27, 1973. In March 1973 she lived at 10500 Lilac Avenue in St. Louis County and had many items of household furniture therein.

Mishka C. (Mike) Jett was employed as an assistant professor of political science at the college and was a city planner and a consultant for several municipalities including Columbia, Illinois. Mr. Jett had been an assistant professor at the college for about three years at the time of trial. In 1950 he married Anna Lee Dotson and a child, Spencer, was born of that marriage. In 1953 his wife died and in 1954 he married Rosemary Mueller. They had three children—Thomas, Michelle and Eddie. Eddie was about the same age as Mrs. Breece's daughter, Robin. Mr. Jett and Rosemary separated in October 1971, but there is some dispute as to the official date they were divorced. The Illinois divorce decree indicated that the parties were officially divorced on April 4, 1973, but the hearing in Illinois and one document indicated they were divorced on March 14, 1973.

During the time of these events Jett was living either in Collinsville, Illinois or with his mother in Belleville, Illinois. In January 1973 he entered into a lease-purchase agreement with Mr. Leon Gordon to lease and purchase a home at 4224 Roland Avenue in Pasedena Hills. He was to take possession on June 1, 1973.

While working at the community college Sharon first became "aware" of Mr. Jett in October 1972 when they were on a compensation committee of the college. Their first real meeting occurred on March 1, 1973 when they attended a committee meeting at Forest Park Community College and Sharon "rode home with Mr. Jett." On the ride they discussed the work of the committee, their children and other matters. Two days later, on March 3, 1973[1], after an evening theater performance at the college, there was a college-sponsored party at Jack's restaurant. Sharon attended the party with a friend, Susan Seeley Morrow, and met other friends there—Wendy Chytka, Nancy Wright and Ronald Eldringhoff, a faculty member. Mr. Jett was also at the party and joined the group. At the party Mr. Jett "paid a lot of attention to" Sharon. During the course of the conversation, he indicated that he was divorced.[2] That eve-

---

1. Sharon kept a calendar notebook referred to as a diary of the various events in the relationship which was introduced as an exhibit. She started to make diary entries "when I met Mike."

2. Sharon could not recall his exact words. Mr. Eldringhoff indicated that as they were socializing Jett stated "we bachelors had to stay together, or something of that type, which led me to believe that he was a bachelor." Wendy

ning Sharon and Mike spent about four hours together. Jett made a "big to do about being over the hill, that he was turning 40, you know." When the evening was over, Jett and Sharon drove her friends home and then returned to the restaurant parking lot where they "talked a long time." They talked about their children, that they were divorced and "the problems we had in marriage." The evening ended with "kind of like a friendly kiss." Over the next few days they saw each other on several evenings and Sharon "liked him a lot and enjoyed talking to him, I guess. I felt very comfortable with him."

By March 14, "I really cared about him. I really did." She had the feeling that he "cared a lot for me." On March 16, Sharon and Mike went out to dinner to celebrate his birthday because he had indicated it was going to be his 40th birthday.[3] By March 16, "I knew I loved him" and Sharon thought that he felt the same way. According to Sharon, Jett proposed marriage to her on March 23, 1973. Sharon accepted.

Sharon testified that prior to the proposal on March 23 she did not have intercourse with Mike and prior to the date of the proposal she had never had intercourse except with her former husband, Louis.

That evening they discussed plans for the wedding and the sale of Sharon's home on Lilac. Mr. Jett (not Sharon) wrote in Sharon's diary under date of June 29, "I'm going to get married today!!!, to Mike Jett." During the next week, Jett told her repeatedly that he loved her and sometime during that week they decided on a date—

June 29, 1973—for the ceremony of marriage. The selection of a date apparently took place over lunch at the school cafeteria. After the discussion selecting the date, they then went to their friends, Susan Seeley Morrow and Ron Eldringhoff, and Jett asked Ron to be his best man and Sharon asked Susan to be her maid of honor.

Sometime between March 23 and 30, Jett asked Sharon to accompany him to Columbia, Missouri to attend a meeting in which he was to participate.

The day before they left, March 29, "with the anticipation of marriage" Sharon went to her gynecologist to obtain "some birth control pills."[4] The doctor gave her some. She stated that she started taking them on May 6.

On March 30, Sharon and Mike went to the Columbia meeting and registered at a motel as Mr. and Mrs. Mishka Jett. That night they "made love."[5] At that time Sharon believed that Mike was divorced and believed that he was going to marry her. Sometime later, Sharon confided to a friend who stayed with Robin during the Columbia trip that she had had intercourse with Jett in Columbia.

On April 6, Sharon and Mike visited Reverend Robert A. Ottoline, pastor of St. Ann's Church, to discuss marriage plans and to obtain permission from church authorities to be married in the church. During the interview Father Ottoline took notes. His notes indicated that Jett told Father Ottoline he was born in 1933 (not 1931) and was divorced in March, *1972.* The priest

---

Chytka stated that Mr. Jett indicated he had been divorced two or three years. According to Mr. Jett he stated that " 'Bachelors should stick together.' "

3. Mr. Jett was born in Ghent, Belgium and left there when he was 16 years old. At times he indicated his birthdate to be March 16, 1931 "but there is a question about it." Documents indicated his date of birth as 1931 and 1933. In his deposition he indicated his date of birth as March 16, 1931, "the one which I had been doing all along." But he had used the date March 16, 1933. As will be seen he gave that date to the priest when he and Sharon went to see him about their marriage.

4. On cross-examination Sharon testified that the doctor gave her a month's supply and that Mike thought it would be a good idea if she went on birth control pills. "Q. When did he say that to you? A. Well, in anticipation of the trip we had, you know, we were going on the trip."

5. On cross-examination she testified that before they went to Columbia they talked about sharing the same room at a motel. She also stated that at the time they left St. Louis she was aware that she and Mr. Jett would have sexual relations that evening.

forwarded a letter to his superiors seeking permission for the couple to be married in the church.

In April, Sharon and Mike picked out furniture, silver and china and other household items.

On May 2, Mike, as chairman of the salary schedule committee of the college, sent a memorandum to the members calling a meeting of the committee. At the bottom of the memorandum he stated "Have a good weekend. I will. (Sharon and I are picking out our rings)." Handwritten at the bottom were the words "Love you." Sharon received this memorandum.

On May 3, Sharon "contracted verbally" with Mr. Denny Krupinski to build some bookcases for Mike's study in the home he was to take possession of on June 1—4224 Roland Avenue. Sharon paid Krupinski $175.00 and later paid him a total of $275.00 and at the time of the trial still owed him $250.00.

On May 10, Sharon's friends gave her a wedding shower, and on May 19, Sharon and Mike went to pick out wedding rings at a local jewelry store. They visited the store and an exhibit indicated that the engravings would be "I love you Sharon" and "I love you Mishka."

On May 21, a mathematics division party was held at the college at which both Sharon and Mike wore nametags indicating a "Newly Wed To Be."

On June 6, Sharon and Mike bought two red velvet chairs which became, among other items, the subject of dispute in the suit and Sharon "put them on my Master Charge." She paid "[e]very penny" for them.

June 15 was an eventful day in the life of Sharon. On that date (1) she closed the sale of her house on Lilac Avenue and received for the sale a few days later—June 20—$10,000 net[6]; (2) she quit her job as a secretary "[b]ecause we were going to be married and Mike asked me to quit"; (3) Sharon and Mike went to dinner at Jack's restaurant to "celebrate my last day at work"; and (4) the first postponement of the wedding occurred. "He told me that the wedding was going to have to be postponed, and the reason he gave me it was going to have to be postponed was because he was working in Columbia and he was really busy and couldn't get time off for our honeymoon. We had hoped to take off." He thought that the wedding would be "completed in two weeks, and he said no longer than a month." Sharon agreed to the postponement.

Since Sharon had sold her home on Lilac Avenue and the wedding had been postponed, Sharon testified that Mike told her ". . . 'Well, it would be silly for you to go out and rent an apartment for a couple of weeks. . . . Just move into the Roland address.' " At that time Mike was living with his mother in Belleville. Therefore, on June 25, with the help of others, Sharon moved much of her household belongings into the Roland Avenue house and she and Robin moved in. She claimed damages for these and other items[7] which were left in the Roland house when she permanently moved therefrom on September 8 and which had not been returned to her. After suit was filed, some twenty items were returned to her for which she made no claim. Each item on the list, with the exception of the home movies, had a dollar value figure noted on the exhibit. Sharon was asked about the value at trial:

"Q. Does that dollar figure represent your opinion as the owner of that particular item as to its value when you last saw it at the Roland house?

"A. It's the figure that I think *it would be worth today*." (Emphasis added.)

---

6. She deposited the money in a joint savings account in Community Federal Savings and Loan Association in the name of Mishka C. Jett and Sharon A. Breece as joint tenants with right of survivorship.

7. There were some 113 items ranging from a glass cream and sugar pitcher to a movie projector and movie films of herself and her daughter. She made the list of the 113 items "from memory."

At trial, Sharon did not attempt to place a value on the home movies.

The total value of all these items, excluding the films, amounted to approximately $4,171.00. The value of the items returned to her after the suit was filed was approximately $1,000.00. Her claim for damages was therefore $3,171.00.

After moving into the Roland Avenue house with her daughter, Robin, Sharon stayed until June 27 when she left with her mother who had been visiting to go to her mother's home in Carterville (sometimes referred to as Carlinville). She stayed until July 8. During this period, Jett and his younger children lived in the house on Roland.

On June 27, also, the wedding was postponed for a second time—"[u]ntil possibly the end of, you know, the latter part of August, I would say before classes would begin on campus." [8]

On July 8, Sharon and Robin returned to the Roland home "to give Robin an opportunity to meet friends in the neighborhood because she was going to be starting a new school in the fall."

During the week of July 8, after Sharon returned to the Roland home, she testified that she loaned $300.00 to Mike to pay the remainder of the amount he owed on an automobile which he purchased from his ex-brother and sister-in-law. Sharon gave him cash in that amount. During this time, also, she sold her washer and dryer for $105 and the purchaser wrote a check payable to Jett. Mike told the purchaser " 'You might as well make it out to me since it's both of our money anyway.' "

During this period while Sharon stayed in the Roland house—June through September—she testified that she paid for some repairs totalling approximately $90.30. And over a period of time from March through October, Sharon testified that she loaned Jett, on about ten occasions, a total of approximately $200.00 [9].

Sharon and Robin lived in the Roland house from July 8 until July 27. Mike and his children did not live there. During that period she believed they were still going to get married and they "made love."

On July 25, the relationship took yet another ominous turn. Mike came to see her. For the third time the wedding was postponed. He told her that they were going to have to postpone the wedding for two months and that she would have to move out of the house. He gave as a reason that his children didn't feel that the house was theirs because she and Robin had moved in first and that Eddie and Robin didn't get along. He also told her that Rosemary (his former wife) had told the children that he and Sharon were living together and that is why the children were upset. Sharon was hurt. She decided to visit her step-sister, Peggy Schaffer, in Colorado, and on July 26, the evening before she left, she wrote a letter to Mike and left it for him on the mantel. In the letter she (1) professed her love for him, (2) recalled the times they had planned for their future, (3) wished that she could erase the time her daughter and his young son had met, (4) stated that she thought Rosemary was trying to destroy him and his chance for happiness, (5) considered that they may not be married, but hoped they would be, and (6) stated she would return on August 16 for a wedding rehearsal of a relative and concluded "We almost made the pieces fit." [10]

**8.** According to Jett, the first postponement occurred on June 27 before Sharon went to Carterville. There were a number of reasons for the postponement: inability of Eddie and Robin to get along; and the fact that they were not as sure of things and had perhaps acted hastily in deciding to get married.

**9.** Checks made payable to various stores but cash given to Jett: April 14, $25.00; April 22, $15.00; April 27, $10.00; May 5, $25.00; June 1, $20.00; June 8, $40.00; June 21, $60.00; June 24, $40.00; Sept. 8, $50.00; Sept. 15, $20.00. The total actually comes to $305.00. Of this amount, Jett spent about $45.00 on her for dinners.

**10.** The letter was read to the jury by counsel after Sharon earlier in the trial burst into tears when she referred to the letter. When asked to read the letter counsel stated, "Do the best you can to try to keep your composure as well as you can." Defense counsel objected. The objection and motion for mistrial were overruled.

She left for Colorado by automobile on the morning of July 27. Before she left she withdrew $505 from the Community Federal joint savings account. When she left she took only clothing for her and Robin. Her many items of property remained in the Roland Avenue home.

On the day she left, Mike withdrew $450 from the Community Federal account. On August 7, he withdrew, without her authorization, another $550 and on August 10, withdrew another $600—totalling $1,600.00. Sharon did not know what Mike did with this $1,600.00, but he never gave her any of it.

Sharon returned from Colorado on August 14. She spent the night at her friend Susan's home because she had no key to the Roland house, and she saw Jett the next day—August 15. He again told her they were going to be married, that he loved her, that the wedding was going to be postponed and that she would have to move out for a short time. Although he again told her they were going to be married he set no specific date—perhaps around Christmas.

On August 26, Sharon and Mike had dinner at the Roland house with Susan Seeley Morrow. Mrs. Morrow testified that the two appeared to be acting as if they were engaged and Jett told her that the wedding was "still on." At trial, Cindy Barker testified that as of August 1, the wedding was still on and that it would take place in a few weeks.

On August 27, Sharon returned to work at the college *district* office. During the time she was unemployed she lost $1,437.50 in wages and $433.99 loss of seniority.[11]

On September 8, Sharon left the Roland Avenue home permanently and moved to an apartment on Joyce-Ellen Lane. She moved what she needed to get by "for a couple of months," but left her 113 items in the Roland home.

The court for the record considered defense counsel's characterization accurate from "my personal observation."

11. On June 15, Sharon earned $6,800 per year. When she returned to work in August she earned $7,053.00.

Finally, on October 27, Mike called Sharon at her apartment on Joyce-Ellen and said "he couldn't marry me." He gave the children as a reason. Sharon asked him about making arrangements to come over and get "my things" and make some arrangements how to repay the money he took, and he replied, " 'You haven't got a leg to stand on, no way you can prove it. . . . If you come near my house I'll have you arrested for trespassing.' " [12]

After the October 27 conversation Sharon "didn't know what to do, so I talked to my friend Susan" and she "said I should go see a lawyer."

A petition for damages was filed on November 21, 1973, originally in three counts, but during trial the third count was dropped. An amended petition was filed seeking damages in Count I for seduction under a promise of marriage and in Count II for the "conversion" of her property and money.

Count I alleged that plaintiff was a person of "chaste character" and that defendant promised to marry her, and led her to believe that the marriage would take place within a reasonable time; that after the promise to marry was made, "defendant seduced and had sexual relations with plaintiff, which seduction was brought about and accomplished by means of the defendant's promise to marry plaintiff previously made, through defendant's persuasions and importunities;" and that by reason of the seduction she became greatly distressed in mind and body, has suffered humiliation and disgrace, and will continue to suffer humiliation and disgrace the remainder of her life. She alleged that the defendant breached his promise to marry and that the promises were false. She alleged that she "allowed" defendant to "seduce and have sexual relations with her, all in reliance on and in

12. Jett denied making this statement on October 27. He denied that the conversation took place.

expectation of marriage." She prayed for actual and punitive damages.

In Count II plaintiff alleged that in expectation of marriage she "transferred all or substantially all of her property from her former home . . . to a house located at 4224 Roland, belonging to defendant . . . ;" that she was entitled to immediate possession of the items; and that she requested defendant to return her property but that he refused to do so constituting an "unauthorized act of dominion or ownership over" the property inconsistent with her rights, so that the property was converted to his own use. She also sought damages for (1) $1,600.00 which defendant withdrew from the joint savings account "which monies defendant converted to his own exclusive use," (2) the bookcases which cost her $450.00 because the bookcases were "converted" to the defendant's exclusive use, (3) $90.30 paid to third parties for the repair of items in the Roland Avenue home, and (4) $300.00 which she withdrew from her checking account and "transferred" to the defendant which "defendant converted to his own exclusive use." She therefore prayed for $6,611.80 actual damages and $10,000.00 punitive damages.[13]

Trial was held for five days in October 1975.

The principal witnesses were Sharon and Mike and the above facts were related at trial. There were certain additional witnesses who stated that Mike's reputation in the community for truth and veracity was poor or very poor. Other witnesses testified that his reputation was excellent or very good.

The trial court gave a number of instructions. Instruction No. 3 [14] was the verdict director on Count I—seduction. Instruction No. 7 [15] was the verdict director on Count II—conversion. Instruction No. 11 was plaintiff's damage instruction on the seduction count. Instruction No. 12 [16] was the

---

**13.** Her petition did not specifically pray for the $300.00 Sharon said she loaned Jett to pay off his car. The damages as shown by the exhibit which the jury viewed showed that she was seeking damages for $300.00 for that money for the car. The damages she sought at trial showed:

1. Property—$3,419.50 ($4,171.50 less $1,000 = $3,171.50, but counsel used the figure in a comment $3,169.50 + $250.00 she still owed to Krupinski) ------------------------------$3,419.50
2. Jett's withdrawals from Community Federal ----------- 1,600.00
3. Car loan ---------------------- 300.00
4. Misc. loans -------------------- 200.00
5. Washer and dryer ---------------- 105.00
6. Home improvements -------------- 90.30
7. Salary—2½ months ------------- 1,437.50
8. Seniority rights ----------------- 433.99

Total: $7,586.29

The petition, however, did not mention the car loan or the miscellaneous loans.

The brief for the appellant argues that her damages amounted to $5,716 under Count II. It is difficult to determine how this figure is arrived at. The total appears to be $5,549.00.

**14.** "Your verdict must be for the plaintiff on Count I of plaintiff's claim for damages if you believe:

First, plaintiff was previously of a chaste character; and

Second, defendant promised to marry plaintiff; and

Third, plaintiff accepted defendant's promise of marriage; and

Fourth, defendant repeated his promise of marriage to plaintiff, knowing said promise or promises to be false; and

Fifth, said promise or promises of marriage were calculated to induce plaintiff to discontinue being of chaste character; and

Sixth, said false promise or promises of marriage *resulted* in plaintiff's *sexual submission* to defendant." (Emphasis added.)

**15.** "Your verdict must be for plaintiff on Count II of plaintiff's claim for damages if you believe:

First, plaintiff owned certain items of property and money as mentioned in evidence, and

Second, said property and money came into the possession of defendant, and

Third, plaintiff made a demand upon defendant to return said property and money, and

Fourth, defendant has wrongfully refused to return said property and money to plaintiff despite plaintiff's demand therefore [sic]."

**16.** "If you find the issues in favor of the plaintiff on plaintiff's claim for damages on Count II, then you must award the plaintiff such sum as you believe will fairly and justly compensate the plaintiff for any damages you believe she sustained as a direct result of the occurrence as submitted in Instruction No. 7."

Compare Instruction No. 17 on behalf of the defendant which reads as follows:

"If you find the issues in favor of Defendant on his claim against Plaintiff, then you must

measure of damage instruction on the conversion count and Instruction No. 13 was the punitive damage instruction.

The cause was argued and after deliberations, the jury found in favor of Sharon and awarded her actual and punitive damages on both counts. After the overruling of a motion for new trial, Mr. Jett appealed.

### III

### *The Contentions on Appeal*

On this appeal the appellant, Mr. Jett, alleges that the trial court erred (1) in failing to grant a directed verdict because Sharon was a "sexually experienced" adult divorcee who cannot, as a matter of law, recover damages for seduction; (2) in giving Instruction No. 3, the verdict director on the seduction count, because it omits two material elements of the tort (a) that Sharon relied on Jett's promise of marriage and (b) that in reliance thereon she had sexual intercourse with him; (3) in giving Instruction No. 7, the verdict director on the conversion count, because it permitted the jury to find that the defendant converted money loaned when in reality there was a debtor-creditor relationship; (4) in giving Instruction No. 12, the measure of damage instruction, because it failed to limit Sharon's recovery to the fair market value of the personal property at the time of the demand to return the property, and because there was no testimony of the value of the property left in the Roland house at the time of the conversion but only testimony at the time of the trial, and because the instruction given was MAI 4.01 whereas 4.02 (relating to property) should have been given; and (5) in giving Instruction No. 13, the punitive damage instruction, because it was submitted in the disjunctive thus authorizing punitive damages on both the seduction and conversion counts even though the jury may have found the defendant's conduct willful or malicious in only one of the counts.

award the Defendant such sum as you find from the evidence to be the *fair market value* of the property described in Defendant's Exhibit X at the time Defendant demanded its return from Plaintiff." (Emphasis added.)

Appellant does not specifically raise the issue of the sufficiency of the evidence; therefore, we do not reach that issue.

Appellant also contends that the verdict on the "conversion" count was excessive and the result of bias, passion and prejudice because the verdict of $8,000 on Count II exceeded the $5,716 actual damages proved and because of Sharon's "outbursts of passion during the trial."

Respondent, on the other hand, contends in her 76-page brief that (1) Instructions Nos. 3, 7, 12 and 13 were proper,[17] (2) the trial court did not err in overruling the motion for directed verdict and (3) the verdict was not excessive or the result of bias and prejudice.

### IV

### *The Seduction Count*

The initial issue with which we are confronted is whether the court erred in failing to grant defendant's motion for a directed verdict because the plaintiff was a sexually experienced adult divorcee who cannot, as a matter of law, recover for her own seduction. He does not specifically raise the issue that the evidence was insufficient to make a submissible case.

The arsenal of judicial remedies to protect familial rights under the common law were many and varied. The common law action of seduction was but one of the judicial remedies to protect such rights. The action developed from the actions of trespass and trespass on the case. It was exclusively the action of the father to recover damages for the loss of services of the daughter. The gist of the action was the father's loss of services of the daughter, but damages could be recovered for the father's loss of honor and for the disgrace to himself and his family. Since the gist of the action was one for loss of services, such services

17. The point in respondent's brief fails to tell us why and wherein such instructions were proper.

under the common law had to be proved. Because the loss of services was in reality a fiction,[18] the most trivial services were sufficient. *Vossel v. Cole,* 10 Mo. 634 (1847)—[daughter over 21 years]. Because the cause of action rested in the father, no action could be maintained under the common law by the seduced female against the seducer. *Roper v. Clay,* 18 Mo. 383, 385 (1853); *Jordan v. Hovey,* 72 Mo. 574, 576 (1880); Anno., 121 A.L.R. 1487, 1488 (1939); *Thibault v. Lalumiere,* 318 Mass. 72, 73, 60 N.E.2d 349, 350, 158 A.L.R. 613 (1945). Since the woman consented to the illicit intercourse, she was barred by the doctrine of *volenti non fit injuria* and because she was *in pari delicto.*

In time, courts came to recognize that loss of services was a fiction and the fiction was obsolete for a modern society, so the courts held forthrightly that the action could be maintained without such loss of services. See Prosser, Law of Torts, 4th ed., pp. 885–886 (1971). The courts also came to recognize, especially under modern pleading statutes, that the woman had an action in her own name to recover for her seduction. *Comer v. Taylor,* 82 Mo. 341 (1884); *Hyatt v. McCoy,* 194 N.C. 25, 138 S.E. 405 (1927); *Hood v. Sudderth,* supra, 16 S.E. at 400.

There were special circumstances, however, even under the common law, when the woman could maintain suit in her own name. If it were alleged that the defendant committed a tortious trespass upon her person in which she was not *particeps criminis* or *in pari delicto* and there was undue influence, force, duress, overpowering influence or a dominating fiduciary control over her or where there was a promise of marriage, the woman could maintain the action for seduction in her own name. *Kirkpatrick v. Parker,* 136 Fla. 689, 697, 187 So. 620, 623–624, 121 A.L.R. 1481 (1939); *Paul v. Frazier,* 3 Mass. 71, 73 (1807)—no action for seduction in absence of an allegation of a promise to marry and its breach; *Colly v. Thomas,* 99 Misc. 158, 161, 163 N.Y.S. 432, 433–434 (1917).[19]

■ In order to maintain the action, a seduction must have occurred whether under a promise of marriage or not. The word seduction is derived from the Latin "se" (away) and "duco" (to lead). Modern lexicographers define seduction as the act of persuading a woman to surrender her chastity. Seduction, in general terms, therefore, means to withdraw one from the path of rectitude. It is a leading astray, and, as applied to intercourse with a woman under a promise of marriage, it implies that a woman of previous chaste character has been induced to consent to unlawful sexual relations by persuasion and the promise to marry. *Clemons v. Seba,* 131 Mo.App. 378, 379, 111 S.W. 522 (1908). A woman is seduced when she is deceived by arts and blandishments,[20] corrupted and drawn aside from the right path. *State v. Wheeler,* 108 Mo. 658, 662, 18 S.W. 924, 925 (1892). Seduction, when applied to the conduct of a man towards a female, means the use of some influence, promise, art,[21] or means by which he induces the woman to surrender her chastity and her virtue to his embraces.

In 70 Am.Jur.2d, Seduction, § 36, p. 78 (1973) it is stated:

" . . . Generally speaking, . . . three more or less definite forms of conduct on the part of the defendant have been recognized as sufficient to authorize

---

18. "It was well understood that this was a mere fiction, and that damages were awarded really for the wrong and injury done her." *Hood v. Sudderth,* 111 N.C. 215, 218–219, 16 S.E. 397, 399 (1892).

19. "Under the common law a woman seduced could not maintain an action herself against her seducer. . . .

There are, however, certain recognized exceptions to the general rule, as where the seduction is accomplished under promise of mar-

riage, or brought about by force or threats." *Colly v. Thomas,* supra, 163 N.Y.S. at 433–434.

20. Deception is the art of deceiving—the intentional misleading of another by a falsehood spoken or acted. *Suther v. State,* 118 Ala. 88, 24 So. 43, 44 (1898).

21. Art is the skillful and systematic arrangement or adaptation of means for the attainment of some desired end. *Suther v. State,* supra, 24 So. at 45.

an action: (1) solicitation and importunity; (2) lovemaking creating a desire in the woman for improper relations; and (3) false promises and artifice. Although the three often concur and cannot be clearly distinguished, the presence of any one of them appears to be sufficient to support an action." Quoted in *Seamons v. Spackman*, 81 Idaho 361, 341 P.2d 442, 444 (1959).

However, there must be something more than a mere reluctance on the part of the woman to commit the act, and her consent must be obtained by false promises, artifice or urgent importunity and relying on said promises she surrendered herself. *Carter v. Murphy*, 10 Cal.2d 547, 562, 75 P.2d 1072, 1079–1080 (1938).

While most of the actions for seduction in past decades have been brought by impressionable young women, an adult woman,[22] is not precluded from maintaining such an action. But if a woman of mature years is allowed to recover damages, she must be required to show that she has been prudent and that she exercised at least ordinary discretion and had sacrificed her virtue through an influence which was calculated to lead astray an honest minded woman. A "female a long way beyond girlhood" cannot claim to have been "defrauded" unless the false promises "are of such a character as are calculated to mislead an ordinary prudent and virtuous minded woman." *Breon v. Hinkle*, 14 Or. 494, 500, 13 P. 289, 292 (1887).[23]

While it is generally stated that only an unmarried,[24] chaste woman may recover in an action of seduction, an unmarried women, whether a widow or divorcee, is not precluded from maintaining a civil action and recovering damages. Decisions have held that she is an "unmarried woman" within the meaning of seduction statutes.[25] *Phillips v. Ashworth*, 220 Ala. 237, 124 So. 519 (1929); *Wiley v. Fleck*, 189 Iowa 614, 178 N.W. 410 (1920). In *Phillips v. Ashworth*, supra, the court expressly held that a divorced woman is an unmarried woman within the meaning of a statute authorizing an unmarried woman to maintain an action of seduction. A woman who is *chaste* at the time of the seduction may maintain an action and recover. *Phillips v. Ashworth*, supra, 124 So. at 521.

In *Wiley v. Fleck*, supra, a 44-year-old divorcee came to Iowa and was engaged for several years in earning a livelihood. The defendant was a farmer. He wanted her to keep house for him. He promised to marry her and take care of her brother and forced his attentions upon her. The Supreme Court of Iowa held that it cannot be held that a divorced woman is not within the protection of the law. "There is nothing unchaste or immodest in the marriage relation . . . ." *Wiley v. Fleck*, supra, 178 N.W. at 414.

In the whole history of the State of Missouri there have been only nineteen appel-

22. *Bowman v. Hart*, 161 Tenn. 402, 404–405, 33 S.W.2d 58, 59 (1930).

23. In this case the court held that the jury should be instructed that the plaintiff could not recover unless it appeared from the evidence that the defendant employed such artifice or deceit as was calculated to mislead a virtuous woman and that she was misled and deceived in consequence thereof. *Breon v. Hinkle*, supra, 13 P. at 294. Woman was 28 years of age and twice married and divorced.

In *Seamons v. Spackman*, supra, 341 P.2d at 444, the court approved an instruction which instructed the jury that "Seduction is defined as the act of inducing a woman of a previous chaste character to consent to unlawful sexual intercourse, brought about by enticement, persuasion or promise of marriage on the part of the person charged with the act . . . ."

24. In *Hyatt v. McCoy*, supra, 138 S.E. 407, only an unmarried woman may seek recovery. A married woman cannot maintain an action. "A married woman by reason of the marital relation acquires a knowledge which ought to guard her from dangers of which an unmarried woman might have no knowledge."

25. *State v. Eddy*, 40 S.D. 390, 391–392, 167 N.W. 392, 393 (1918); *People v. Weinstock*, 140 N.Y.S. 453, 456 (Sup.1912); *State v. Wallace*, 79 Or. 129, 131, 154 P. 430 (1916). Contra *Jennings v. Commonwealth*, 109 Va. 821, 63 S.E. 1080 (1909). In the latter case the court stated that because she was married she is familiar with the ways of men and was immune from their "wiles." 63 S.E. at 1081.

late judicial decisions for damages for seduction. The first was *Carder v. Forehand,* 1 Mo. 704 (1826)—damages of $40.00. Most turned on the question of the proper party to maintain suit, or matters of evidence. *McKern v. Calvert,* 59 Mo. 243 (1875)—evidence of woman's character after seduction not admissible. A few cases relate to damages. Except for *Boedges v. Dinges,* 428 S.W.2d 930 (Mo.App.1968), the latest case is *Owens v. Fanning,* 205 S.W. 69 (Mo.App. 1918). None, except *Clemons v. Seba,* supra, deals with the elements of the action. Most of the reported decisions were decided in the third quarter of the 19th century.

In summary, while it is difficult to cull from all the decisions the principles of the action of seduction, in our view these principles emerge:

1. The action in this, unlike other states, is based upon the common law and is not a statutory action;

2. Today, unlike the common law, the woman, whether a minor or an adult, may maintain the action in her own name provided that she is unmarried at the time of the seduction—she may be a divorced woman;

3. The conduct of the defendant must consist of such solicitations, importunities, misrepresentations, knowingly false promises or artifices, including a false promise to marry for the purpose of seduction, which lead the plaintiff, a chaste unmarried woman, to deviate from the path of rectitude;

4. The deviation must occur because of the false solicitations, importunities, false promises or false promise to marry;

5. The plaintiff, having a right to rely upon the artifices or false promises, relied upon such promises or artifices;

6. Relying on such false promises or artifices, the plaintiff consented to unlawful sexual intercourse; and

7. The action is a species of fraud and the evidence to support a judgment must be clear, cogent and convincing.

Whether an action for seduction should be retained in contemporary society as a matter of judicial policy is highly questionable. The arsenal of such judicially created remedies has, in modern times, been abolished by legislatures of several states for a multitude of reasons. Recent social trends and the changing mores of contemporary society concerning sex and morality and the new found status of women may well make the action for seduction a remedy of a bygone era. In many states civil actions for sexual involvement have been abolished by the so-called "Heart Balm Statutes."[26] There has come to be a realization today that actions of this kind have failed to accomplish their original social purpose and are considered by many jurisdictions to be socially unwise. Such actions are subject to great abuses, causing embarrassment, humiliation and damage to persons who may be wholly innocent and perhaps such actions afford a fertile field for blackmail and extortion.[27]

26. "Heart Balm" statutes repealing actions for seduction—Alabama: 3 Code of Ala., title 7, § 115 (1960); Alaska: repealed § 09.15.030 (1962) which had given an unmarried female over the age of majority the right to sue for seduction; California: West's Ann.Calif.Codes, § 43.5, Civil Code (1954); Colorado: 6 Colo. Rev.Stat., § 13–20–202 (1973); Delaware: 6 Delaware Code Ann., title 10, § 3924 (1975); Florida: 21A Fla.Stat.Ann., § 771.01 (1964); Indiana: Burns Ind.Stat.Ann., § 34–4–4–1 (Code Ed.1973); Michigan: 29 Mich.Compiled Laws Ann., § 551.301 (1967); New Jersey: 2A N.J.Stat.Ann., § 2A:23–1 (1952); New York: 8 McKinney's Consol.Laws of N.Y.Ann., Civil Rights Law, § 80–a (1976); Oklahoma: Okla. Stat.Ann., title 76, § 8.1 (Supp.1976–1977); Washington: Rev.Code of Wash.Ann., § 4.24.-030 (1962)—giving remedy to sue repealed by Laws, 1st Ex.Sess.1973, ch. 154, § 121; Wyoming: 2 Wyo.Stat., § 1–728 (1959).

See generally, Feinsinger, Legislative Attack on "Heart Balm," 33 Mich.L.Rev. 979, 987–988; Prosser, Law of Torts, supra, at 887; See also *Heck v. Schupp,* 394 Ill. 296, 68 N.E.2d 464, 167 A.L.R. 232 (1946); Anno., 167 A.L.R. 235 (1947); *Aadland v. Flynn,* 27 Misc.2d 833, 211 N.Y.S.2d 221 (1961)—an excellent discussion of modern morals. This action was not sustained against the former actor Errol Flynn.

27. Writing of statutes which authorize a woman to recover damages for seduction, Vernier states:

"Approval or disapproval of the foregoing statutes in general must depend in part upon the social policy of the particular jurisdiction. It is the writer's opinion, however, that such

The woman of today is not the woman of yesteryear. She has a new-found freedom. The modern adult woman is sophisticated and mature. The former notion that women belong to the weaker sex has long been abandoned. The modern woman is not "easily beguiled" and does not easily fall to the "wiles" of man. Women desire and should be held to a reasonable responsibility.

■ While we believe that an action for seduction is socially unwise in modern society, we believe that as an intermediate appellate court we cannot abolish the action.[28] But we do urge the General Assembly to re-examine this and other common law civil actions in this area to determine whether they are compatible with modern society and whether they should be abolished once and for all—especially as such actions relate to a mature adult woman.

■ After reviewing the evidence offered and the principles relating to the present action for seduction, we believe that under the present state of the law an unmarried sexually experienced divorced woman may maintain an action for seduction.

■ However, because of the principles relating to the law of seduction, we are compelled to reverse and remand the cause for further proceedings because Instruction No. 3 was erroneous in that it failed to submit the fact that defendant's promise or promises were knowingly false when made

and made with the intent to seduce and that plaintiff relied upon the promise or promises and in reliance thereon plaintiff consented to sexual intercourse.

On this issue we are compelled to reverse and remand the cause for further proceedings.

V

*The Conversion Count*

On this second count of the petition appellant urges error in the giving of certain instructions relating to the property left in the Roland Avenue home and the money to which Sharon alleged she was entitled. Appellant contends that Instruction No. 7 was error because it permitted the jury to find that defendant "converted" money loaned, money paid for repairs on the Roland Avenue home, and money expended for bookcases. He also contends that the court erred in giving Instruction No. 12, the damage instruction on Count II, because it (a) fails to limit recovery to the fair market value of the property (the 113 items), (b) there was no evidence as to the value [29] of the property at the time of the conversion and (c) MAI 4.02, and not MAI 4.01, should have been given. He argues that a debt or money cannot be the subject of a conversion and hence Instruction No. 7 was error.

The respondent, of course, contends otherwise. She contends that Missouri law permits recovery of money on a "conversion" theory and that she proved facts suf-

statutes are undesirable. While it is true that in some cases of violated innocence the action would satisfy a just need, it is felt that its accompanying dangers swing the balance in favor of retention of the common-law rule. Fraud, oppression, and blackmail are manifest dangers, as is abuse at the hands of gullible and sympathetic juries. As in the case of breach-of-promise suits, the action will often fail to protect those who need it most. Women with refined sensibilities will not bring action. The lack of a requirement of a promise of marriage or similar limiting condition to liability makes it possible for almost every act of intercourse with an unmarried female to be held to constitute a seduction under the statutes. The modern tendency toward equalization of men's and women's social, economic, political, and legal

rights would seem to forbid the placing of such a heavy liability upon the male party to consensual sexual intercourse. Any policy designed to protect immature females or the offspring of such connections is already sufficiently covered by provisions for statutory rape and bastardy proceedings." 4 Vernier, American Family Laws, § 252, p. 268 (1936).

**28.** *Cf. O'Dell v. School District of Independence,* 521 S.W.2d 403, 407–408 (Mo. banc 1975), *cert. den.* 423 U.S. 865, 96 S.Ct. 125, 46 L.Ed.2d 94; *Abernathy v. Sisters of St. Mary's,* 446 S.W.2d 599 (Mo. banc 1969).

**29.** The exhibit introduced indicated a value on each of the items, but there was no precise value placed on the home movies.

ficient to support both conversion and for money had and received.

The tort of conversion has had a long and involved history.[30] Conversion is a comprehensive yet "fascinating" tort. In modern law conversion "is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." Restatement of the Law, Second, Torts, § 222A (1965).[31] Conversion may be committed in many ways. Restatement of the Law, supra, § 223. "Conversion may be proved in one of three ways: (1) by tortious taking; (2) by any use or appropriation to the use of the person in possession, indicating a claim of right in opposition to the rights of the owner; (3) by refusal to give up possession to the owner on demand." *Arnold v. Prange,* 541 S.W.2d 27, 30 (Mo.App.1976). Where intangible rights are merged in or identified with some document, conversion may be maintained. Prosser, Law of Torts, supra, at 81–82; *Cf. Twellman v. Lindell Trust Co.,* 534 S.W.2d 83, 97 (Mo.App.1976); Hill, A New Found Haliday, etc., supra, at 525–527; 18 Am.Jur.2d, Conversion, §§ 9–19 (1965); see U.C.C. § 3–419 (when instrument may be converted). While it has been said that "[t]here is perhaps no very valid and essential reason why there might not be conversion of an ordinary debt, . . ." Prosser, Law of Torts, supra, at 82, the process of expanding the tort has never developed to the point where conversion may be maintained for an "indefinite," "intangible" or "incorporeal" species of proper-

ty. Thus, conversion does not lie for the appropriation of an idea, *Norman Schuman Interiors, Inc. v. Sacks,* 479 S.W.2d 200 (Mo. App.1972), nor will conversion lie for a mere debt.[32] *Western Casualty & Surety Co. v. First State Bank,* 390 S.W.2d 913, 922 (Mo.App.1965)—money had and received.

The measure of damages in an action for conversion of ordinary personal property is the reasonable market value of the personal property at the time of the conversion. *Pantz v. Nelson,* 234 Mo.App. 1043, 135 S.W.2d 397, 403 (Mo.App.1939); *Oliver v. Oliver,* 508 S.W.2d 209, 211 (Mo.App.1974) (not replacement value). It is not essential that proof of the value of the converted property be confined to the very time of the conversion, and it is sufficient that there be evidence tending to prove the value within a reasonable time before or after a conversion. However, the time must be reasonable. *Elden v. Tweed,* 295 S.W.2d 397, 403 (Mo.App.1956).

A different principle has developed in the case of heirlooms or of property having special or sentimental value. In *Shewalter v. Wood,* 183 S.W. 1127 (Mo.App.1916), plaintiff sought damages for conversion of certain heirlooms, rare books and valuable items of sentimental value. In such a case the plaintiff is not restricted to the mere market value of the property, but the law recognizes that articles of small market value may have special value. As a general principle, recovery for sentimental value of personal property cannot be had in a suit for conversion, but as to such things as

---

**30.** See articles collected in Prosser, *The Nature of Conversion,* 42 Cornell L.Q. 168 (1957); Hill, *A New Found Haliday: The Conversion of Intangible Property,* etc., 1972 Utah L.Rev. 511; and Prosser, Law of Torts, supra, at 79.

**31.** See Prosser, The Nature of Conversion, supra, 42 Cornell L.Q. at 173–174; *Carson Union May Stern Co. v. Pennsylvania R. Co.,* 421 S.W.2d 540, 543 (Mo.App.1967); *State v. Feld Chevrolet, Inc.,* 403 S.W.2d 672, 680 (Mo.App. 1966).

**32.** See cases collected in 18 Am.Jur.2d, Conversion, § 10 (1965); Anno., 44 A.L.R.2d 927, 942 (1955) citing several Missouri cases including

*R. H. Kobusch Furniture & Carpet Co. v. Lowenberg,* 194 Mo.App. 551, 185 S.W. 747 (1916). Respondent relies on a series of cases in Missouri which she contends hold that "money may properly be the subject of an action of conversion." *Coleman v. Pioneer Studebaker, Inc.,* 403 S.W.2d 948 (Mo.App.1966); *Southern Agency Co. v. Hampton Bank of St. Louis,* 452 S.W.2d 100 (Mo.1970); *Brede Decorating, Inc. v. Jefferson Bank & Trust Co.,* 345 S.W.2d 156 (Mo.1961). These cases are inapposite to the situation here. *Coleman* was an action for the conversion of specific money held on deposit. *Brede* was a case involving checks.

family pictures, heirlooms and the like which cannot be replaced and have value to the owner, the rule requires "the allowance of damages in compensation of the reasonable special value of such articles to their owner." *Shewalter v. Wood,* supra, 183 S.W. at 1128.[33] Such value is not the proper subject of personal opinion of the owner but rather "the jury was obliged to ascertain the amount of the damages in the light of all the facts and circumstances." *Kalinowski v. M. A. Newhouse & Son,* 53 S.W.2d 1094, 1097 (Mo.App.1932).

In Count II the plaintiff pleaded that the defendant converted (1) various items of household goods and other items including the bookcases and movie films of herself and her daughter which she left at the Roland Avenue home by refusing to return her property, (2) $1,600 from the Community Federal account by withdrawing that amount, (3) $90.30 which she paid to third parties for goods and services, and (4) money which she "transferred" to the defendant at various times.

■ It is clear that Instruction No. 7, based upon the petition filed, is in error. It authorizes a recovery, based upon a theory of conversion, for both specific personal property which defendant refused to return and for money which was the subject of an ordinary debt. Conversion is not the proper remedy to recover an ordinary debt. Neither is conversion the proper remedy for the withdrawal of the $1,600 from the joint bank account. One joint owner has the right to withdraw funds from a joint account. While he may be subject to some appropriate relief during the lifetime of the parties, he cannot be considered a converter. *Cf. In re Estate of LaGarce,* 487 S.W.2d 493 (Mo. banc 1972); *Carroll v. Hahn,* 498

S.W.2d 602 (Mo.App.1973). See also *R. H. Kobusch Furniture & Carpet Co. v. Lowenberg,* supra, 185 S.W. at 747, 748—corporation could not maintain trover against vice president who was authorized to draw money from the company account when he applied the funds to his own use. Money is the subject of conversion only when it can be described or identified as a specific chattel.

■ Although under modern procedure there is but one form of action, Rule 42.01, § 506.040 RSMo., insofar as a theory of a petition is concerned,[34] a party cannot sue upon one cause of action and recover upon another. He can recover only on the cause of action asserted in the petition. *Matthews v. Truxan Parts, Inc.,* 327 S.W.2d 28, 35–36 (Mo.App.1959); *Cf. Duncan's Adm'r. v. Fisher,* 18 Mo. 403, 405 (1853). Instruction No. 7 intermingles items which are properly recoverable in conversion and items which are not properly recoverable.

As to Instruction No. 12, the damage instruction, there is no particular damage instruction in MAI relating to conversion, and we believe that neither MAI 4.01 nor 4.02 is applicable to a cause of action in conversion. Instructions relating to conversion of goods have usually stated that the value of the goods is to be determined as of the time of the "conversion." *Spitzengel v. Greenlease Motor Car Co.,* 234 Mo.App. 962, 136 S.W.2d 100, 103 (Mo.App.1940); *Detmer v. Miller,* 220 S.W.2d 739, 745 (Mo.App. 1949); *Rembaugh v. Phipps,* 75 Mo. 422, 423 (1882).

■ There was no evidence by the plaintiff as to the value of the personal property at the time of the conversion or within a reasonable time thereafter. Sharon testified that the dollar figure on each of the

---

**33.** In *Shewalter,* the court held that the sentimental value was not the proper subject of personal opinion but should be left to the jury. But, in *State v. Ace Storage & Moving Co.,* 135 S.W.2d 363, 368 (Mo.App.1940), plaintiff testified as to the value of the goods. This court held that her ability to accurately value the

property affected only the weight of her testimony and not the competency.

**34.** See Note, *The Theory of a Pleading Under the Missouri Code,* 22 Wash.U.L.Q. 251 (1937); *Aetna Casualty & Surety Co. v. Lindell Trust Co.,* 348 S.W.2d 558, 563–564 (Mo.App.1961).

household items represented the figure "it would be worth today." [the time of trial which took place some two years after she left the Roland Avenue home.]

Since the cause is to be reversed and remanded on Count II, we believe that the damage instruction should be tailored to reflect the market value of those items of personal property having no sentimental value as of the time of the conversion. As to those items having sentimental value, the jury should determine the value of those items based on the evidence and facts adduced at trial.

■ As to this aspect of the case, therefore, we conclude that (1) Instruction No. 7 is erroneous because it permits recovery based on a theory of conversion which was pleaded by the plaintiff for items which are not properly the subject of a conversion theory, (2) there was insufficient evidence of the value of the property properly the subject of conversion within a reasonable time after the alleged conversion, (3) Instruction No. 12 is erroneous because it did not contain language that the damages of the property subject to conversion were limited to the fair market value thereof, and (4) neither MAI 4.01 nor 4.02 is the applicable instruction in a case of this kind, but a "not in MAI" instruction should be given which would reflect the proper amount of damages of those items which have a market value and for those items which have a sentimental value.

We are, therefore, compelled to reverse and remand the cause for a new trial on Count II.

### VI

■ Appellant contends that the court erred in giving Instruction No. 13, the punitive damage instruction, because it permitted the jury to award punitive damages on both Counts I and II even though the jury may have found defendant's conduct malicious on one of the two counts only. We agree. An instruction may not be confus-

ing, misleading or misdirect the jury. *Woodford v. Illinois Central Gulf Railroad Co.*, 518 S.W.2d 712, 716 (Mo.App.1974). On retrial there should be, if warranted by the evidence, a punitive damage instruction on each count.

### VII

■ Defendant also contends that the verdict was excessive and the result of passion, bias and prejudice. It has long been the rule that an appellate court will not infer bias or prejudice merely from the amount of the verdict, but the party raising the issue must show some incident or occurrence at the trial or error committed of such a nature as to engender bias, passion or prejudice. *Reynolds v. Arnold*, 443 S.W.2d 793, 801 (Mo.1969). Since we reverse and remand the cause, we need not dispose of this point at this time.

### VIII

We have read the entire lengthy transcript; we have read the briefs and all of the authorities cited by both counsel; we have engaged in our own independent exhaustive research; and we conclude that the judgment entered on Counts I and II must be reversed and remanded for further proceedings.

The judgment is reversed and remanded.

NORWIN D. HOUSER and ALDEN A. STOCKARD, Special Judges, concur.